No. 25-6183

# UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

ASTRAZENECA PHARMACEUTICALS LP,

*Plaintiff-Appellee*,

v.

GENTNER DRUMMOND, in his capacity as Oklahoma Attorney General; and GLEN MULREADY, in his capacity as the Insurance Commissioner of the State of Oklahoma,

*Defendants-Appellants.*

On appeal from the United States District Court
for the Western District of Oklahoma
The Hon. Patrick R. Wyrick
No. 5:25-cv-1156-PRW

# OPENING BRIEF OF DEFENDANTS-APPELLANTS GENTNER DRUMMOND AND GLEN MULREADY

GARRY M. GASKINS, II
*Solicitor General*
ZACH WEST
*Director of Special Litigation*
WILL FLANAGAN
*Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
William.Flanagan@oag.ok.gov
*Counsel for Defendants-Appellants*

**ORAL ARGUMENT IS REQUESTED**

# TABLE OF CONTENTS


**RELATED CASES** .......... 1

**STATEMENT OF JURISDICTION** .......... 1

**ISSUES PRESENTED** .......... 2

**INTRODUCTION** .......... 3

**STATEMENT OF THE CASE** .......... 4

- **A. Congress created the 340B Program without mentioning delivery.** .......... 4
- **B. HHS has increasingly favored pharmacy access in the Program.** .......... 7
- **C. Some covered entities under 340B use the "replenishment model."** .......... 9
- **D. Drug manufacturers responded by restricting pharmacy access and suing.** .......... 10
- **E. Oklahoma passed H.B. 2048 to protect underserved populations.** .......... 12

**STANDARD OF REVIEW** .......... 15

**SUMMARY OF ARGUMENT** .......... 15

**ARGUMENT** .......... 16

- **I. AstraZeneca's Preemption Claims Are Not Likely to Succeed.** .......... 16
  - **A. The court below erred by not presuming against preemption.** .......... 17
  - **B. H.B. 2048 is not field preempted.** .......... 20
  - **C. H.B. 2048 is not conflict preempted.** .......... 24
    - **i. H.B. 2048 regulates delivery of drugs, not their price.** .......... 26
    - **ii. H.B. 2048's enforcement does not conflict with the Program.** .......... 34
    - **iii. H.B. 2048's prohibition against requiring claims data does not conflict with federal law.** .......... 38
- **II. The District Court Erred by Granting an Injunction Before the State Had an Opportunity to Oppose AstraZeneca's Motion.** .......... 40
- **III. The district court improperly weighed the remaining injunction factors.** .......... 43

**CONCLUSION** .......... 46

**STATEMENT REGARDING ORAL ARGUMENT** ...................................... **46**
**CERTIFICATE OF COMPLIANCE** ................................................................ **48**
**CERTIFICATE OF DIGITAL SUBMISSION** ................................................ **48**
**CERTIFICATE OF SERVICE** ...................................................................... **48**
**ATTACHMENT: DISTRICT COURT ORDER (10/31/2025)** ....................... **49**

## TABLE OF AUTHORITIES

### Cases

*Abbott v. Perez*,
585 U.S. 579 (2018) ....................43

*AbbVie Inc. v. Bailey*,
2025 WL 1918948 (E.D. Mo. July 11, 2025) .................... 26, 30

*AbbVie, Inc. v. Fitch*,
152 F.4th 635 (5th Cir. 2025).................... 3, 11, 19, 20, 21, 22, 23, 26, 28, 29, 34, 35

*AbbVie Inc. v. Fitch*,
2024 WL 3503965 (S.D. Miss. July 22, 2024) ....................12, 23, 26, 29, 30

*AbbVie, Inc. v. Murrill*,
2026 WL 350685 (5th Cir. Feb. 9, 2026)....................3, 19, 20, 23, 26, 28, 31, 33, 34, 35

*AbbVie Inc. v. Neronha,*
1:25-cv-00388-JJM-AEM (D.R.I. Sept. 30, 2025) .................... 12, 26

*AbbVie Inc. v. Skrmetti*,
2025 WL 1805271
(M.D. Tenn. June 30, 2025)....................9, 12, 20, 23, 24, 25, 26, 29, 30, 31, 39, 40, 46

*AbbVie, Inc. v. Weiser*,
2025 WL 3041825 (D. Colo. Oct. 31, 2025).................... 11, 12, 20, 21, 34, 39

*Am. Hosp. Ass'n v. Becerra*,
596 U.S. 724 (2022) ....................3, 5, 43

*Arizona v. United States*,
567 U.S. 387 (2012) ....................17, 18, 20, 22, 25

*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110 (2011) ....................4, 5, 34, 36

*AstraZeneca Pharms. LP v. Bailey*,
2025 WL 644285 (W.D. Mo. Feb. 27, 2025) ....................12

*AstraZeneca Pharms. LP v. Fitch*,
766 F. Supp. 3d 657 (S.D. Miss. 2024) .................... 12, 26

*AstraZeneca Pharms. LP v. Harris,*
No. 4:24-cv-00268-KGB (E.D. Ark. Sept. 30, 2025).................... 12, 27

*Bradshaw v. Am. Airlines, Inc.*,
123 F.4th 1168 (10th Cir. 2024) .......... 20

*Buckman Co. v. Plaintiffs' Legal Committee*,
531 U.S. 341 (2001) .......... 19

*California v. ARC Am. Corp.*,
490 U.S. 93 (1989) .......... 18

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992) .......... 18

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) .......... 35

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
269 F.3d 1149 (10th Cir. 2001) .......... 15

*Eli Lilly & Co. v. Kennedy*,
2025 WL 1423630 (D.D.C. May 15, 2025) .......... 9

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990) .......... 36

*Fuentes v. Shevin*,
407 U.S. 67 (1972) .......... 36

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
373 U.S. 132 (1963) .......... 20

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*,
373 U.S. 132 (1963) .......... 41, 42

*Genesis Health Care, Inc. v. Becerra*,
701 F. Supp. 3d 312 (D.S.C. 2023) .......... 6

*Gonzales v. Oregon*,
546 U.S. 243 (2006) .......... 18

*GTE Corp. v. Williams*,
731 F.2d 676 (10th Cir. 1984) .......... 15

*Hillsborough Cnty. v. Automated Med. Labs., Inc.*,
471 U.S. 707 (1985) .......... 18, 20, 33

*In re Lane*,
726 F. Supp. 3d 1305, 1317 (D. Wyo. 2024)....................42

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
480 U.S. 470 (1987)....................45

*Mount Olivet Cemetery Ass'n v. Salt Lake City*,
164 F.3d 480 (10th Cir. 1998)....................18

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins.*,
514 U.S. 645 (1995)....................18

*Novartis Pharms. Corp. v. Fitch*,
738 F. Supp. 3d 737 (S.D. Miss. 2024)....................12, 26

*Novartis Pharms. Corp. v. Frey*,
2025 WL 2813787 (D. Me. Sept. 23, 2025)....................12, 26

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024)....................5, 6, 10, 11, 21, 22, 25

*Oneok, Inc., v. Learjet, Inc.*,
575 U.S. 373 (2015)....................17, 24

*Parker v. Brown*,
317 U.S. 341 (1943)....................17

*Paul v. Monts*,
906 F.2d 1468 (10th Cir. 1990)....................22, 31

*PhRMA v. Fitch*,
2024 WL 3277365 (S.D. Miss. July 1, 2024)....................12, 26, 35

*PhRMA v. Frey*,
2026 WL 184504 (D. Me. Jan. 23, 2026)....................16, 20, 32, 33, 36

*PhRMA v. McClain*,
95 F.4th 1136 (8th Cir. 2024)....................3, 7, 11, 12, 20, 21, 22, 23, 25,
....................26, 27, 28, 29, 31, 33, 34, 35

*PhRMA v. McClain*,
645 F. Supp. 3d 890 (E.D. Ark. 2022)....................26

*PhRMA v. Morrisey*,
760 F. Supp. 3d 439 (S.D. W. Va. 2024)....................12, 27, 32

*PhRMA v. Murrill*,
2024 WL 4361597 (W.D. La. Sept. 30, 2024) .......... 12, 26

*Planned Parenthood of Indiana, Inc. v. Comm'r of Ind. State Dep't of Health*,
699 F.3d 962 (7th Cir. 2012) .......... 32

*Prairie Band of Potawatomi Indians v. Pierce*,
253 F.3d 1234 (10th Cir. 2001) .......... 15

*Sanofi Aventis U.S. LLC v. HHS*,
58 F.4th 696 (3d Cir. 2023) .......... 4, 5, 6, 10, 11, 21, 22, 24

*Sanofi-Aventis U.S., LLC v. HHS*,
570 F. Supp. 3d 129 (D.N.J. 2021) .......... 5

*Schrier v. Univ. of Colo.*,
427 F.3d 1253 (10th Cir. 2005) .......... 15

*Tarrant Reg'l Water Dist. v. Herrmann*,
656 F.3d 1222 (10th Cir. 2011) .......... 18

*Tripati v. Beaman*,
878 F.2d 351, 354 (10th Cir. 1989) .......... 42

*United States v. Lopez-Avila*,
665 F.3d 1216 (10th Cir. 2011) .......... 15

*United States v. Skrmetti,*
605 U.S. 495 (2025) .......... 30, 31

*Walton v. Powell*,
821 F.3d 1204 (10th Cir. 2016) .......... 17

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 15, 41

*Wyandotte Nation v. Sebelius*,
443 F.3d 1247 (10th Cir. 2006) .......... 42

*Wyeth v. Levine*,
555 U.S. 555 (2009) .......... 18

**Statutes**

28 U.S.C. § 1292 .......... 1

28 U.S.C. § 1331 .......... 1

28 U.S.C. § 1345 .......... 1

28 U.S.C. § 2201 ....................1

38 U.S.C. § 8126 ....................22

42 U.S.C. § 256b ....................5, 6, 7, 10, 21, 24, 27, 38

42 U.S.C. § 1395 ....................4,

42 U.S.C. § 1396 .................... 4, 5

42 U.S.C. § 1983 ....................1

OKLA. STAT. tit. 36, § 5401 .................... 13, 25, 28, 29, 30, 37

OKLA. STAT. tit. 36, § 5403 ....................13, 21, 25, 29, 38

OKLA. STAT. tit. 36, § 5404 .................... 13, 45

OKLA. STAT. tit. 36, § 5405 ....................38

**Rules**

Fed. R. Civ. P. 65(a)(1) ....................41

Fed. R. Civ. P. 65(b)(1)(A) ....................42

Fed. R. Civ. P. 65(b)(2) ....................42

**Other Authorities**

340B Informed, *Keeping Rural Hospitals Open Is a Key Part of 340B* (Mar. 7, 2019).................... 5, 44

Alaa Ziad Haidar, *Recent 340b Contract Pharmacy Troubles and the Necessary Solution*, 33 HEALTH L. 34 (2020) ....................43

GAO, DRUG DISCOUNT PROGRAM: FEDERAL OVERSIGHT OF COMPLIANCE AT 340B CONTRACT PHARMACIES NEEDS IMPROVEMENT 2 (2018)....................10

GAO, *Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* 17–18 (GAO-11-836, Sept. 2011) ....................6

H.R. REP. NO. 102-384(II) (1992)....................4, 6, 32, 33

HHS Off. Gen. Couns., Advisory Opinion 20-06 (Dec. 30, 2020).................... 10, 11

Joel M. Hamme et al., 2 HEALTH L. PRAC. GUIDE § 26A:20 (2024) ....................10

Nicholas C. Fisher, *The 340B Program: A Federal Program in Desperate Need of Revision After Two-And-A-Half Decades of Uncertainty*, 22 J. HEALTH CARE L. & POL'Y 25 (2019) ........................................................................4

Notice Regarding 340B, 75 Fed. Reg. 10,272 (Mar. 5, 2010) ............................................8

Notice Regarding Section 602, 61 Fed. Reg. 43,549 (Aug. 23, 1996)..8, 9, 11, 32, 39, 44

OKLA. HOUSE OF REPRESENTATIVES, Stinson, Howard Comment on Governor's Veto of Bill to Protect Rural Health Care, May 21, 2025.....................................................................................................................45

Ryan P. Knox & Ameet Sarpatwari, *The 340B Drug Pricing Program: Administration, Litigation, and Reform*, 77 OKLA. L. REV. 229 ..........................................................6, 7, 10

## Related Cases

There are no prior appeals. There are three appeals related to the order at issue: *Novartis Pharmaceuticals Corporation v. Drummond*, No. 25-6182; *AbbVie, Inc. v. Drummond*, No. 25-6184; *Pharmaceutical Research and Manufacturers v. Drummond*, No. 26-6001. Additionally, there are two appeals pending in this Court challenging a similar Colorado law, including one by Appellee AstraZeneca. *AstraZeneca Pharms v. Weiser*, No. 25-1466; *AbbVie, Inc. v. Weiser*, No. 25-1439.

## Statement of Jurisdiction

AstraZeneca sued for declaratory and injunctive relief under 28 U.S.C. § 1331 and 42 U.S.C. § 1983. The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345. The district court granted preliminary injunctive relief on October 31, 2025, and Defendants filed a notice of appeal on November 12, 2025. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

1. Whether the federal Section 340B Program, which is silent about delivery of the prescription drugs discounted as part of the Program, preempts an Oklahoma law that regulates delivery of 340B-discounted drugs to pharmacies.

2. Whether the district court erred by granting a preliminary injunction before Oklahoma had an opportunity to respond in opposition.

## INTRODUCTION

To participate in Medicare Part B and Medicaid, the federal 340B Drug Pricing Program ("340B Program" or "Program") requires drug manufacturers to provide a discount to certain healthcare providers. The providers—called "covered entities"—"perform valuable services for low-income and rural communities but have to rely on limited federal funding for support." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 738 (2022). Since the Program began, covered entities have understandably chosen to use pharmacies to provide patients with the discounted prescriptions. Recently, however, manufacturers have begun to restrict the number of pharmacies that covered entities can use. States have pushed back. Oklahoma enacted House Bill 2048 ("H.B. 2048"), which prohibits manufacturers from limiting the delivery options for 340B drugs.

The district court erred in preliminarily enjoining H.B. 2048. Because the 340B Program is silent about delivery of discounted drugs, Oklahoma's regulation of manufacturers' delivery restrictions is not preempted.

AstraZeneca and its fellow manufacturers have now sued in over twenty states, challenging laws like H.B. 2048. They have lost repeatedly, and in every appellate court they have faced. *See Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1139 (8th Cir. 2024); *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 639 (5th Cir. 2025) (per curiam); *AbbVie, Inc. v. Murrill*, --- F.4th ---, 2026 WL 350685, at *1 (5th Cir. Feb. 9, 2026). This Court should reverse the injunction entered below, which was a distinct outlier.

## STATEMENT OF THE CASE[1]

### A. Congress created the 340B Program without mentioning delivery.

Medicare and Medicaid aid elderly and low-income citizens. 42 U.S.C. §§ 1395j, 1396. Those programs cover "almost half the annual nationwide spending on prescription drugs." *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023).

In 1992, Congress established the 340B Program as part of the Veterans Health Care Act, and Congress amended it in 2010. *Id.* The Program addressed an "unintended consequence" of the Medicaid Drug Rebate Program (enacted in 1990) that accidentally ended the common manufacturer practice of giving discounts to safety-net providers. Nicholas C. Fisher, *The 340B Program: A Federal Program in Desperate Need of Revision After Two-and-a-Half Decades of Uncertainty*, 22 J. HEALTH CARE L. & POL'Y 25, 28-30 (2019). Congress was unwilling to "continue to allow" vulnerable populations "to remain unprotected against manufacturer price increases." H.R. REP. NO. 102-384(II), at 11 (1992). Thus, it created a means "to stretch scarce Federal resources as far as possible." *Id.* at 12. In short, the Program allows health care providers to access pricing discounts to "reach[] more eligible patients and provid[e] more comprehensive services." *Id.*

The Program is based on a voluntary "opt-in mechanism." *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 115 (2011). To access Medicare and Medicaid markets, drug makers "must offer their drugs at a discount to certain healthcare providers."

[1] References to the Joint Appendix will read as follows: J.A. [page].

*Sanofi*, 58 F.4th at 699. (citing 42 U.S.C. §§ 256b, 1396r-8(a)(1), (5)). The discount is established by statute and implemented through agreements between the Secretary of the Department of Health and Human Services ("HHS") and each drug manufacturer that cap prices for "covered outpatient drugs." 42 U.S.C. § 256b(a)(1). The discount varies, but "the average discount rate appears to be between 25 and 50 percent." *Sanofi-Aventis U.S., LLC v. HHS*, 570 F. Supp. 3d 129, 208 (D.N.J. 2021), *aff'd in part, rev'd in part on other grounds*, 58 F.4th at 696.

Providers benefitting from the Program are called "covered entities," and they must fit narrow categories such as "black lung clinics, rural referral centers, and hospitals that primarily serve low-income patients." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456 (D.C. Cir. 2024) (citing 42 U.S.C. § 256b(a)(4)). These "include public hospitals and community health centers, many of" which are "providers of safety-net services to the poor." *Astra USA*, 563 U.S. at 113. Unsurprisingly, these providers are less profitable. If left to market whims, covered entities would dwindle—decreasing the healthcare services available to the impoverished and rural. In 2017, 74 percent of rural hospitals used savings from the Program to stay open.[2] Thus, "340B hospitals perform valuable services for low-income and rural communities but have to rely on limited federal funding for support." *Am. Hosp. Ass'n*, 596 U.S. at 738.

---

[2] 340B INFORMED, *Keeping Rural Hospitals Open Is a Key Part of 340B* (Mar. 7, 2019), https://tinyurl.com/340Binformed (last accessed Feb. 18, 2026).

The Program allows covered entities to provide critical services in several ways. First, it grants extra revenue: "they turn a profit when insurance companies reimburse them at full price for drugs that they bought at the 340B discount." *Sanofi*, 58 F.4th at 699. Second, it enables them to provide steep discounts to uninsured patients. *See* GAO, GAO-11-836, DRUG PRICING: MANUFACTURER DISCOUNTS IN THE 340B PROGRAM OFFER BENEFITS, BUT FEDERAL OVERSIGHT NEEDS IMPROVEMENT 17–18 (2011). In short, federal resources are stretched "as far as possible" to "provide more services to a larger population of under-served patients." *Genesis Health Care, Inc. v. Becerra*, 701 F. Supp. 3d 312, 316 (D.S.C. 2023) (quoting H.R. REP. NO. 102-384(II), at 12 (1992). Covered entities have used savings "to fund specialty clinics ...; fund salaries for additional healthcare staff; subsidize charity care spending; and provide patients with free or low-cost medications." Ryan P. Knox & Ameet Sarpatwari, *The 340B Drug Pricing Program: Administration, Litigation, and Reform*, 77 OKLA. L. REV. 229, 231–32 (2025).

The Program is not a blank check. To prevent abuse, Congress limited "covered entities" to a narrow definition. 42 U.S.C. § 256b(a)(4). Moreover, covered entities are prohibited from "resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the entity"—a practice called "diversion." *Novartis*, 102 F.4th at 456 (quoting 42 U.S.C. § 256b(a)(5)(B)). And covered entities are required to assist the federal government in ensuring that manufacturers do not have to provide a 340B discount and a Medicaid rebate. *Id.*

Congress also created compliance measures. Manufacturers and the HHS Secretary may audit covered entities. 42 U.S.C. § 256b(a)(5)(C). If the Secretary finds that the entity resold discounted drugs or did not take steps to prevent duplicate discounts, the Secretary may require payment of a penalty to a manufacturer or remove the entity from the Program. *Id.* § 256b(d)(2)(B)(v)(I), (II). And when a dispute arises between covered entities and manufacturers about pricing, payment, diversion, or double-discounting, the Program requires an administrative dispute resolution process. *Id.* § 256b(d)(3). To use that process, manufacturers must first audit covered entities, which federal law allows. *Id.* § 256b(a)(5)(C). Administrative resolution is "a final agency decision" that is subject to judicial review. *Id.* § 256b(d)(3)(C).

In sum, the Program governs eligibility criteria for covered entities, the discounts they receive, and compliance. It does not regulate the delivery of discounted drugs. And since the Program began, "[p]harmacies have always been important participants in delivering 340B drugs to patients." *McClain*, 95 F.4th at 1142. Indeed, less than five percent of covered entity sites had in-house pharmacies at the time. *See* Knox & Sarpatwari, 77 OKLA. L. REV. at 243 & n.74. The Program's silence on delivery is critical.

### B. HHS has increasingly favored pharmacy access in the Program.

Although HHS possesses limited rulemaking authority, it (through the Health Resources and Services Administration ("HRSA")) has issued nonbinding letters addressing covered entities and their contract pharmacies.

In 1996, HRSA updated its approach. HRSA observed that "many of the larger groups of covered entities … rely on outside pharmacies" to get necessary drugs to patients. Notice Regarding Section 602, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996) ("1996 Guidance"). If entities could not use outside pharmacies, they would face the "untenable dilemma" of running in-house pharmacies—"impossible" for many—or leaving the Program. *Id.* Thus, the Program's purpose of increasing healthcare in underserved areas would not be realized. Acknowledging that the Program "is silent as to permissible drug distribution systems," HRSA acknowledged that covered entities may contract with outside pharmacies, noting that its guidance did not "create a new right but rather [is] simply recognizing an existing right that covered entities enjoy under State law." *Id.* at 43,549.

Later, HRSA emphasized that any limitations on contract pharmacies were untenable. With its 2010 guidance, HRSA opined that entities may contract with an unlimited number of pharmacies regardless of whether they had in-house pharmacies. Notice Regarding 340B, 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010); *Novartis*, 102 F.4th at 457. In doing so, HRSA emphasized that entities still possessed "full responsibility and accountability" to prevent diversion and duplicate discounts. *Id.* at 10,273. HRSA noted that the old model, which limited entities to one contract pharmacy, created "transportation barriers" for patients filling prescriptions. *Id.* This concern was acute for rural patients. Allowing more contract pharmacies, per HRSA, ensures that patients have access to nearby pharmacies.

### C. Some covered entities under 340B use the "replenishment model."

Per HRSA, "[t]here is no requirement for a separate (physical) inventory for drugs purchased at a 340B discount." 1996 Guidance at 43,554. Thus, when a covered entity utilizes a contract pharmacy, it often relies on the "replenishment model" for tracking inventory. *Eli Lilly & Co. v. Kennedy*, No. 24-cv-3220, 2025 WL 1423630, at *2 (D.D.C. May 15, 2025), *appeal docketed*, No. 25-5221 (D.C. Cir. June 13, 2025). In this model, an entity establishes a relationship with a pharmacy. Consider fictional Drug Z. The pharmacy will sell Drug Z from a neutral supply of drugs purchased from a manufacturer. *Id.* The covered entity then employs software that compares information from the pharmacy with information from the entity to identify covered patients who purchased Drug Z from the pharmacy in connection with their care at the entity. *Id.* at *3. Once a full package of Drug Z has been dispensed to entity patients at the pharmacy, the entity then purchases an order of Drug Z at the 340B discounted price to replenish the pharmacy's stock. *Id.* Although the drugs are sold at the pharmacy, it is the entity that purchases the drugs at the 340B price, and the entity receives that price only for the number of units sold to that patient. *AbbVie Inc. v. Skrmetti*, No. 3:25-cv-519, 2025 WL 1805271 at *18–19 (M.D. Tenn. June 30, 2025).

This model allows a pharmacy to dispense a drug from the neutral inventory to a covered entity's patient instead of having to wait on orders of Program-discounted drugs to arrive. Otherwise, the pharmacy would have to maintain separate inventories of drugs for each covered entity it contracts with. This is "very burdensome for many

covered entities." Joel M. Hamme et al., 2 HEALTH L. PRAC. GUIDE § 26A:20 (2024). Just like under any Program model, the covered entity must ensure that it receives only the Program discount for sales of drugs to its patients. And HHS may audit covered entities to ensure compliance. 42 U.S.C. § 256b(a)(5)(C).

**D. Drug manufacturers responded by restricting pharmacy access and suing.**

For years after the 2010 federal guidance, manufacturers complied. Knox & Sarpatwari, 77 OKLA. L. REV. at 256. During that time, the Program grew rapidly, with covered entities and contract pharmacies increasing in number. *See* GAO, DRUG DISCOUNT PROGRAM: FEDERAL OVERSIGHT OF COMPLIANCE AT 340B CONTRACT PHARMACIES NEEDS IMPROVEMENT 2 (2018), https://tinyurl.com/3bkubmfe. These changes eventually prompted a response. Many manufacturers complained about the replenishment model. They also claimed "that contract pharmacies were driving up duplicate discounting and diversion." *Sanofi*, 58 F.4th at 700. As a result, manufacturers "began to limit the number and kinds of contract pharmacies to which they would ship [340B drugs]." *Novartis*, 102 F.4th at 458. For example, AstraZeneca allows entities that lack an in-house pharmacy to use only one contract pharmacy. J.A. 64–65.

In response, HHS released "an Advisory Opinion declaring that Section 340B unambiguously requires drug makers to deliver 340B drugs to an unlimited number of contract pharmacies." *Sanofi*, 58 F.4th at 701 (citing HHS Off. Gen. Couns., Advisory Opinion 20-06 (Dec. 30, 2020)). HHS argued that because the drugs were purchased by

covered entities for patients, the delivery location was irrelevant. *Id.* Subsequently, HHS sent violation letters to manufacturers, *id.,* spawning litigation over HHS authority.

In court, manufacturers argued that HHS could not require them to recognize contract pharmacies because 340B "is silent as to whether manufacturers must deliver those drugs to contract pharmacies." *E.g.*, Brief for Appellee Novartis at 4, *Novartis*, 102 F.4th 452 (D.C. Cir. 2024) (No. 21-5299), 2022 WL 2072941, at *4. The Third Circuit and D.C. Circuit agreed: 340B's text is "silent about delivery" and does not "mention contract pharmacies." *Sanofi*, 58 F.4th at 703; *Novartis*, 102 F.4th at 460. Thus, federal law does not "requir[e] delivery of discounted drugs to an unlimited number of contract pharmacies." *Sanofi*, 58 F.4th at 706. Where Congress declined to legislate, HHS could not "move the program forward." 1996 Guidance at 43,550.

Emboldened, manufacturers began limiting covered entities' ability to have 340B drugs delivered to pharmacies, and "covered entities dependent on contract pharmacies [became] unable to serve patients in need." *McClain*, 95 F.4th at 1139. Seeing this, numerous states responded by "prohibit[ing] manufacturers from" implementing such tactics. *Id.* Facing widespread opposition, manufacturers once again fled to the courts. They have filed lawsuits nationwide seeking injunctions against these state laws on preemption and takings grounds. The two appellate courts to hear these challenges—the Eighth and Fifth Circuits—ruled against the manufacturers because the 340B statute is silent on delivery. *McClain*, 95 F.4th at 1146; *Fitch*, 152 F.4th at 639. At the district court, "the very large majority" of the challenges have been rejected. *AbbVie*

*Inc. v. Weiser*, --- F. Supp. 3d ---, 2025 WL 3041825, at *4 (D. Colo. Oct. 31, 2025).[3] By the State's count, at least 15 federal courts have denied the manufacturers an injunction while only two courts have granted relief.

### E. Oklahoma passed H.B. 2048 to protect underserved populations.

Oklahoma enacted its own version of these laws. Faced with statewide complaints that restrictions on the delivery of 340B drugs to contract pharmacies decreased services to underserved communities, the Oklahoma Legislature overwhelmingly approved, on a bipartisan basis, H.B. 2048. The bill's authors argued that allowing restrictions on the delivery of 340B drugs to contract pharmacies would "undermine[] protections for essential medical services, including cancer treatments and

[3] *See AbbVie Inc. v. Neronha,* 1:25-cv-00388-JJM-AEM (D.R.I. Sept. 30, 2025) (denying preliminary injunction in Rhode Island); *Novartis Pharms. Corp. v. Frey*, 2025 WL 2813787, at *1 (D. Me. Sept. 23, 2025) (same in Maine); *AstraZeneca Pharms. LP v. Fitch*, 766 F. Supp. 3d 657, 664–65 (S.D. Miss. 2024) (same in Mississippi); *Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d 737, 749–50 (S.D. Miss. 2024) (same); *AbbVie Inc. v. Skrmetti*, 2025 WL 1805271, at *18 (M.D. Tenn. June 30, 2025) (same in Tennessee); *AstraZeneca Pharms. LP v. Bailey*, 2025 WL 644285, at *3 (W.D. Mo. Feb. 27, 2025) (dismissing manufacturer's claims in Missouri); *PhRMA v. Murrill*, 2024 WL 4361597, at *8–9 (W.D. La. Sept. 30, 2024) (granting summary judgment to Louisiana); *AbbVie Inc. v. Fitch*, 2024 WL 3503965, at *12 (S.D. Miss. July 22, 2024) (denying preliminary injunction in Mississippi), *aff'd* 152 F.4th 635 (5th Cir. 2025); *PhRMA v. Fitch*, 2024 WL 3277365, at *11 (S.D. Miss. July 1, 2024) (same); *PhRMA v. McClain*, 645 F. Supp. 3d 890 (E.D. Ark. 2022) (granting summary judgment to Arkansas), *aff'd* 95 F.4th 1136 (8th Cir. 2024), *cert. denied*, 145 S.Ct. 768 (2024); *but see AstraZeneca Pharms. LP v. Harris,* No. 4:24-cv-00268-KGB (E.D. Ark. Sept. 30, 2025), ECF No. 141 (denying judgment on the pleadings in Arkansas); *PhRMA v. Morrisey*, 760 F. Supp. 3d 439, 452–60 (S.D.W. Va. 2024) (granting preliminary injunction in West Virginia).

obstetrical care, across [the] state." Okla. House of Representatives, Stinson, Howard Comment on Governor's Veto of Bill to Protect Rural Health Care, May 21, 2025.

Codified at OKLA. STAT. tit. 36, § 5401, et seq., H.B. 2048 states that "[a] manufacturer shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to a 340B entity, unless such receipt is prohibited by [HHS]." *Id.* § 5403(A). Similarly, "[a] manufacturer shall not interfere with a pharmacy contracted with a 340B entity." *Id.* § 5403(B). It defines a "340B drug" as a drug that "has been subject to any offer" pursuant to the 340B program and "purchased by a covered entity." *Id.* § 5401(1). Together, these provisions prohibit manufacturers from stopping Oklahoma providers from contracting with pharmacies to provide 340B-discounted drugs to patients. The Attorney General may establish regulations interpreting H.B. 2048, and he may impose civil fines for violations. *Id.* § 5404(B).

A handful of manufacturers sued. Below, AstraZeneca argued that H.B. 2048 is preempted by Section 340B and preempted by federal patent law. J.A. 59–60.

On October 31, 2025, going against the grain of nearly all the courts to analyze these issues, the court below granted a preliminary injunction to all three manufacturers in one opinion, on 340B preemption and Takings Clause grounds. (It declined to rule on AstraZeneca's patent law claim.) This order was issued before the State responded to AstraZeneca's motion. For preemption, the court did not specify field or conflict preemption. It held that although H.B. 2048 was framed as a delivery regulation, it

actually regulates price because it "requires manufacturers to deliver drugs to contract pharmacies at a discounted price when they would otherwise be delivered at full price." J.A. 114. The court found that the law effectively made contract pharmacies "covered entit[ies]" and interfered with the balance struck by the Program. *Id.* at 116. The court also held that the prohibition on requiring claims data obstructs manufacturers' ability to trigger federal audits and access the ADR process. *Id.* at 119.

Separately, the court held that H.B. 2048 likely effects an unconstitutional taking by restricting manufacturers from refusing to deliver 340B drugs to contract pharmacies without providing a benefit on top of access to Medicaid and Medicare. *Id.* at 354.[4] The court also found that requiring manufacturers to provide a discount to covered entities only served private interests. *Id.* at 355. As the court saw it, this taking was not done for a public purpose because "hospitals are not required to deploy 340B profits towards charity care, nor is there convincing evidence ... that covered entities would cease to serve high-needs patients but for the 340B profits from sales at unlimited numbers of contract pharmacies." *Id.* at 356.

The district court described its order as "based on purely legal questions presented to it" in a later order staying proceedings pending resolution of this appeal. Doc. 98, *AbbVie v. Drummond*, No. 5:25-cv-726 (W.D. Okla.). In other words, although the court sporadically cited the hearing, it granted relief solely on legal grounds. This

[4] AstraZeneca did not raise this claim below.

explains why the same order applied to Novartis and AstraZeneca, even though neither submitted evidence or asked for a hearing.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council Inc.*, 555 U.S. 7, 24 (2008). A movant must show that (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. Put simply, preliminary injunctions are the "exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984). And "the right to relief must be clear and unequivocal." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quotation omitted). This Court reviews a preliminary injunction for an abuse of discretion. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1153 (10th Cir. 2001). "A district court abuses its discretion if it commits an error of law, or is clearly erroneous in its preliminary factual findings." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1243 (10th Cir. 2001) (quotation omitted). Legal determinations are reviewed *de novo*. *United States v. Lopez-Avila*, 665 F.3d 1216, 1219 (10th Cir. 2011).

## SUMMARY OF ARGUMENT

This Court should reverse the district court's outlier of an injunction. Congress created the 340B Program as a voluntary pricing condition for manufacturers seeking access to the Medicare and Medicaid markets, but it said nothing about the mechanics

of drug delivery and the use of pharmacies. That silence is dispositive, and States retain the ability to act in this arena. Because the 340B Program does not regulate delivery or mention the use of pharmacies, Oklahoma is free to legislate to further public health. Every appellate court to consider similar state laws has rejected the manufacturers' theories, and the district court's contrary conclusion rests on a misunderstanding of H.B. 2048 and an unwarranted expansion of federal power to the detriment of rightful State authority.

The manufacturers' preemption claims fail at the threshold. Nothing in the 340B statutes occupies the field of drug delivery, and nothing in Oklahoma's law conflicts with federal requirements. H.B. 2048 simply prevents manufacturers from imposing unilateral distribution restrictions that federal law does not authorize. The statute complements, rather than frustrates, the 340B scheme by ensuring that covered entities can continue serving low-income and rural patients.

AstraZeneca is unlikely to succeed, and the district court misapplied the remaining injunction factors, so the preliminary injunction should be reversed.

## ARGUMENT

### I. ASTRAZENECA'S PREEMPTION CLAIMS ARE NOT LIKELY TO SUCCEED.

AstraZeneca has argued that H.B. 2048 is field and conflict preempted. Although the district court did not expressly embrace conflict preemption, its reasoning seemingly rested there. *See, e.g.*, J.A. 116 (describing H.B. 2048 as expanding the definition of covered entity "contrary to federal law"); *see also Pharm. Rsch. & Mfrs. of Am. v. Frey*, No.

1:25-cv-469, 2026 WL 184504, at *9 n.8 (D. Me. Jan. 23, 2026) (characterizing the decision below as grounded in conflict preemption). This Court should thus reverse on conflict preemption grounds and remand. But out of an abundance of caution, the State addresses field preemption. *Cf. Walton v. Powell*, 821 F.3d 1204, 1212 (10th Cir. 2016) (explaining that this Court may "affirm a district court on alternative grounds … if those grounds are adequate, apparent in the record, and sufficiently illuminated by counsel on appeal"). As AstraZeneca did not raise a Takings claim below, this appeal is limited to preemption because that is the only aspect of the order applicable to AstraZeneca.

**A. The court below erred by not presuming against preemption.**

In our federalist system, "the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012). Certainly, "the Laws of the United States" take priority over conflicting state laws. U.S. CONST. art. VI, cl. 2. But "the states are sovereign, save only as Congress may constitutionally subtract from their authority." *Parker v. Brown*, 317 U.S. 341, 351 (1943). Congress can preempt state laws in several ways, including "through express language in a statute." *Oneok, Inc., v. Learjet, Inc.*, 575 U.S. 373, 376 (2015). Indisputably, Congress did not include express preemption language in the 340B statute.

When federal law does not expressly preempt, plaintiffs must prove Congress "implicitly" preempted state law through field or conflict preemption. *Id.* at 376–77. Field preemption occurs only when "Congress has forbidden the State to take action in the field that the federal statute pre-empts." *Id.* at 377. In other words, Congress

determines that a domain "must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. Conflict preemption arises when "compliance with both state and federal law is impossible," or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *California v. ARC Am. Corp.*, 490 U.S. 93, 100–01 (1989) (quotations and citation omitted).

The party asserting preemption "bears the burden of showing with specificity that Congress intended to preempt state law." *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 489 n.4 (10th Cir. 1998). Preemption intrudes on the States' sovereignty, thus any analysis "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... [a] Federal Act unless that [is] the clear and manifest purpose of Congress." *Cipollone v. Liggett Grp.*, Inc., 505 U.S. 504, 516 (1992) (citation omitted); *see also N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins.*, 514 U.S. 645, 654 (1995) (starting with "presumption that Congress does not intend to supplant state law"). This presumption applies particularly to "state or local regulation of matters related to health and safety." *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715 (1985); *see also Gonzales v. Oregon*, 546 U.S. 243, 270 (2006). As a result, this Court "is especially reluctant to find preemption in matters of longstanding state regulation." *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1242 (10th Cir. 2011). Notably, Congress and the FDA have consistently regarded state law "as a complementary form of drug regulation" that "offers an additional, and important, layer of consumer protection." *Wyeth v. Levine*, 555 U.S. 555, 578–79 (2009).

H.B. 2048 prohibits manufacturers from refusing to deliver 340B discounted drugs to contract pharmacies. It is an exercise of authority by Oklahoma to help providers serve vulnerable patients, fund critical programs and uncompensated care, and make drugs cheaper. This effort falls squarely within a traditional domain of state regulation: public health. *Fitch*, 152 F.4th at 646.

Below AstraZeneca pointed to *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), to argue that there is no presumption against preemption here, but that case is inapplicable. J.A. 68. In *Buckman*, the state statute's field was "policing fraud against federal agencies," which is not a field that states have traditionally occupied. 531 U.S. at 347. And *Buckman* even noted that the situation in front of it was "in contrast to situations implicating federalism concerns and the historic primacy of state regulation of matters of health and safety." *Id.* at 348 (citation and quotations omitted). Moreover, the state tort law was preempted in *Buckman*, not because it touched on a federal statute, but because the federal statute spoke specifically to the issue. *See* 531 U.S. at 348 ("the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration").

AstraZeneca also argued that the presumption against preemption should not apply because the law regulates participants within a federal program. But as the Fifth Circuit explained, the law "does not regulate the 340B program itself. It regulates the delivery of drugs to pharmacies—an area left free under the 340B Program for state supplementation." *Murrill*, 2026 WL 350685, at *5. H.B. 2048 also regulates "the

practice of pharmac[ies]" which is "traditionally left to state regulation." *McClain*, 95 F.4th at 1143. In short, the law regulates "matters related to health and safety." *Hillsborough Cnty.*, 471 U.S. at 715. When faced with similar statutes, courts have applied the presumption. *McClain*, 95 F.4th at 1143; *Fitch*, 152 F.4th at 646; *Murrill*, 2026 WL 350685, at *4–5; *AbbVie Inc. v. Skrmetti*, No. 3:25-cv-519, 2025 WL 1805271, at *12–13 (M.D. Tenn. June 30, 2025); *AbbVie Inc. v. Weiser*, --- F. Supp. 3d ---, No. 25-cv-1847, 2025 WL 3041825, at *8 (D. Colo. Oct. 31, 2025). The district court erred by ignoring this presumption.

**B. H.B. 2048 is not field preempted.**

For field preemption, federal law must be "'so pervasive' that it leaves no space for state supplementation," or the federal interest must be "so dominant" that it can "be assumed to preclude enforcement of state laws on the same subject."' *Bradshaw v. Am. Airlines, Inc.*, 123 F.4th 1168, 1173 (10th Cir. 2024) (quoting *Arizona*, 567 U.S. at 399). Nothing less than an "unambiguous congressional mandate" suffices for a finding of field preemption. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 147 (1963).

No court analyzing similar state laws has found field preemption, and the Fifth and Eighth Circuits have expressly rejected this path. *See, e.g.*, *McClain*, 95 F.4th at 1144 ("Congressional silence on pharmacies in the context of 340B indicates that Congress did not intend to preempt the field."); *Fitch*, 152 F.4th at 647 (similar); *Murrill*, 2026 WL 350685, at *5 (similar); *Frey*, 2026 WL 184504, at *8 (similar). The district court here did

not address field preemption, at least not by name. Given all this, AstraZeneca faces an extremely high burden to show field preemption. It has not met that burden.

Start with the text of the 340B Program statute. The Program caps the price that participating manufacturers may "offer" covered entities, 42 U.S.C. § 256b(a)(1), and then it imposes requirements on those entities, *id.* § 256b(a)(5). Those requirements include prohibitions on diversion and duplicate discounts. *Id.* § 256b(a)(5)(A), (B). To enforce these rules, the statute authorizes audits and grants HHS the ability to impose monetary penalties. *Id.* § 256b(a)(5)(C), (D). In short, the statute addresses the field of drug pricing—at least in relation to certain (340B) healthcare providers, drugs, and manufacturers. And it does not even fully occupy that field.

On delivery conditions, the 340B statute is silent—as all appellate courts to consider the program have confirmed. *Novartis*, 102 F.4th at 460; *Sanofi*, 58 F.4th at 703; *McClain*, 95 F.4th at 1142–43; *Fitch*, 152 F.4th at 648. Given this silence, "it cannot be that Congress has enacted a scheme that governs 'every detail' of the 340B Program." *Weiser I*, 2025 WL 3041825, at *6. In fact, the 340B statute never mentions the term "pharmacy." 42 U.S.C. § 256b. H.B. 2048 fills that silence by regulating delivery. Specifically, it prohibits manufacturers from "deny[ing], restrict[ing], prohibit[ing], or otherwise interfer[ing] with ... the acquisition of a 340B drug ... or [the] delivery" of said drug. OKLA. STAT. tit. 36, § 5403(A). And it states that "[a] manufacturer shall not interfere with a pharmacy contracted with a 340B entity." *Id.* § 5403(B). In sum, the law forbids manufacturers from limiting the pharmacies a covered entity may use to

dispense 340B drugs. Oklahoma law does not regulate drug price, directly or indirectly. *See McClain*, 95 F.4th at 1145. Thus, Oklahoma has not "enter[ed] ... an area the Federal Government has reserved for itself." *Arizona*, 567 U.S. at 402.

Again, the 340B statute contains no express preemption clause and is silent as to the delivery of drugs to pharmacies. *Novartis*, 102 F.4th at 460; *Sanofi*, 58 F.4th at 703; *McClain*, 95 F.4th at 1142–43; *Fitch*, 152 F.4th at 646. This omission is telling given that "[p]harmacies have always been an essential part of the 340B Program." *McClain*, 95 F.4th at 1143. That silence—paired with pharmacy regulation traditionally falling within state authority—"indicates that Section 340B is not intended to preempt the field." *Id.* (citation omitted) *see also Paul v. Monts*, 906 F.3d 1468, 1475 n.8 (10th Cir. 1990) ("Congressional silence will not be assumed to mandate preemption."). Congress's decision not to regulate delivery forecloses AstraZeneca's sweeping theory. *Fitch*, 152 F.4th at 646.

Moreover, "Congress 'knew how to impose delivery-related requirements' and regulate distribution" but chose not to. *Fitch*, 152 F.4th at 646 (quoting *Sanofi Aventis*, 58 F.4th at 704). At the same time Congress created the 340B Program, it created a separate program that regulated "the prices that federal agencies pay for drugs." *Sanofi Aventis*, 58 F.4th at 704. That program is codified at 38 U.S.C. § 8126(a)(2). Unlike the 340B statute, it regulated delivery of discounted drugs. *Id.* § 8126(a)(2), (h)(3)(A)(ii). The Congressional decision to not regulate distribution within the 340B Program indicates "that it did not intend to occupy the entire field in this area." *Fitch*, 152 F.4th at 646.

AstraZeneca's attack on the replenishment model does not change this conclusion. H.B. 2048 speaks to delivery alone, whether the delivery happens before or after a drug is dispensed to a patient. *See Fitch II*, 2024 WL 3503965, at *13–14. Consider a pharmacy and covered entity that decline to use the replenishment model. There, the entity purchases the drugs from the manufacturer and has them shipped to the pharmacy. Upon receipt, the pharmacy dispenses the drug to the entity's patients. There can be no question, in that scenario, that H.B. 2048's requirement that the manufacturer send drugs to the pharmacy is regulating delivery. The only difference with the replenishment model is that the drug is replenished *after* the pharmacy has dispensed the drug on hand to the entity's patients. In both cases, "[t]he amount of the discount is not at issue and is not affected by the state scheme." *Skrmetti*, 2025 WL 1805271, at *18 (rejecting a manufacturer's replenishment argument because a similar state law merely "impos[ed] restrictions on where [the manufacturer] is willing to *deliver* drugs").

In other words, the replenishment model does not change who purchases the drug. Only covered entities may do so. It does not change the price of the drug. That is set through the Program. *Fitch*, 152 F.4th at 646. So, the covered entity places an order and the manufacturer receives the same payment that it would if the delivery was made to the covered entity's front door. The pharmacy's role is custodial: it holds the drug and dispenses it to the covered entity's patient. *Murrill*, 2026 WL 350685, at *6; *McClain*, 95 F.4th at 1144. The replenishment model is an inventory accounting system. Whether the discount arrives before or after dispensation of the drug is a logistical

detail. It does not affect pricing. *Skrmetti*, 2025 WL 1805271, at *18 ("even under the replenishment model ... [t]he amount of the discount is not at issue and is not affected by the state scheme").[5]

H.B. 2048 regulates in a field—delivery of drugs—where federal law is silent. Congress did not clearly and manifestly preempt laws like H.B. 2048 that fill this void.

### C. H.B. 2048 is not conflict preempted.

Conflict preemption exists only where it is truly "impossible" to comply with state and federal law or where state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok*, 575 U.S. at 377 (quotation and citation omitted). H.B. 2048 produces no such impossibility or obstacle.

The Program consists of "three basic parts: (1) a cap on drug makers' prices, (2) restrictions on covered entities, and (3) compliance mechanisms." *Sanofi*, 58 F.4th at 699. The ceiling price is set by statute, and manufacturers must offer that price to covered entities if the drug is available to purchasers. *Id.* at 700. Covered entities, in turn, are prohibited from diverting the drugs to other patients or getting the discount on drugs already subject to a Medicaid rebate. *Id.* The "substantive requirements and restrictions are few," and the compliance mechanisms are varied. *Id.* Manufacturers and

---

[5] In any event, it appears that HRSA does not believe that the replenishment model interferes with the operation of the program. Although the replenishment model has been used for years, HRSA has not taken any action to curb the practice. In fact, HRSA's own prime vendor has acknowledged the use of the replenishment model. *See, e.g.*, 340B PRIME VENDOR PROGRAM, HRSA FAQs, FAQ ID: 1222, https://www.340bpvp.com/hrsa-faqs.

covered entities are subject to audits. 42 U.S.C. § 256b(a)(1), (a)(5)(C). HHS may impose sanctions, *id.* §§ 256b(a)(5)(D), (d)(1)–(2), and Congress created a process for resolving "payment, pricing, diversion, or discount disputes." *McClain*, 95 F.4th at 1142.

Congress's "framework of regulation," *Arizona*, 567 U.S. at 399, expands no further, and, again, Congress did not include any express preemption clause. And nothing in that framework regulates drug delivery—it is "silent about delivery conditions." *Novartis*, 102 F.4th at 460. H.B. 2048 speaks into that silence by barring manufacturers from "deny[ing], restrict[ing], prohibit[ing], or otherwise interfer[ing] with ... the acquisition of a 340B drug ... or [the] delivery" of said drug. OKLA. STAT. tit. 36, § 5403(A). The point is clear: "[a] manufacturer shall not interfere with a pharmacy contracted with a 340B entity." *Id.* § 5403(B).

One can search high and low in the text of H.B. 2048 to find a regulation of pricing of any sort without success. *See McClain*, 95 F.4th at 1145. Rather, the law applies to drugs already "offer[ed]" at the 340B price. OKLA. STAT. tit. 36, § 5401(1). It does not interfere with the discount rates set under the 340B program. Instead, the law prohibits manufacturers from "interfer[ing] with a pharmacy contracting with a 340B entity." *Id.* § 5403(B). H.B. 2048 simply ensures that the patients may receive covered drugs at contract pharmacies. It is a law "entirely" focused on "the *delivery* of 340B drugs." *Skrmetti*, 2025 WL 1805271, at *12.

i. **H.B. 2048 regulates delivery of drugs, not their price.**

Every appellate court to consider the issue has held that similar state laws regulate delivery, not price. *Murrill*, 2026 WL 350685, at *7 ("Act 358 does not regulate prices."); *McClain*, 95 F.4th at 1145 ("Arkansas is simply deterring pharmaceutical manufacturers from interfering with a covered entity's contract pharmacy arrangements."); *Fitch*, 152 F.4th at 646. The district court, however, concluded that H.B. 2048 is "a law regulating pricing." J.A. 114. To get there, the court attempted to distinguish the Eighth Circuit's holding that a similar Arkansas law regulates delivery and not price. *Id.* at 113 (citing *McClain*, 95 F.4th at 1142–44). The court below did not acknowledge or grapple with the Fifth Circuit's decision in *Fitch*, 152 F.4th 635, which rejected a nearly identical challenge. And after the district court's decision, a different Fifth Circuit panel reaffirmed *Fitch's* holding. *Murrill*, 2026 WL 350685, at *7. Nor did the district court interact with the substantial body of district court authority supporting laws like H.B. 2048.[6] These omissions are striking.

[6] *See, e.g.*, *AbbVie Inc. v. Neronha,* 1:25-cv-00388-JJM-AEM (D.R.I. Sept. 30, 2025) (denying preliminary injunction in Rhode Island); *Frey I*, 2025 WL 2813787, at *1 (D. (same in Maine); *AstraZeneca Pharms. LP v. Fitch*, 766 F. Supp. 3d 657, 664–65 (S.D. Miss. 2024) (same in Mississippi); *Novartis Pharms. Corp. v. Fitch*, 738 F. Supp. 3d 737, 749–50 (S.D. Miss. 2024) (same); *Skrmetti*, 2025 WL 1805271, at *18 (same in Tennessee); *AstraZeneca Pharms. LP v. Bailey*, 2025 WL 644285, at *3 (W.D. Mo. Feb. 27, 2025) (dismissing manufacturer's claims in Missouri); *PhRMA v. Murrill*, 2024 WL 4361597, at *8–9 (W.D. La. Sept. 30, 2024) (granting summary judgment to Louisiana); *AbbVie Inc. v. Fitch*, 2024 WL 3503965, at *12 (S.D. Miss. July 22, 2024) (denying preliminary injunction in Mississippi), *aff'd* 152 F.4th 635 (5th Cir. 2025); *PhRMA v. Fitch*, 2024 WL 3277365, at *11 (S.D. Miss. July 1, 2024) (same); *PhRMA v. McClain*, 645 F. Supp. 3d 890 (E.D. Ark. 2022) (granting

In any event, the district court's sidestep of *McClain* was unpersuasive. In disagreeing with *McClain*, the court below did not analyze the text of the statutes so much as speculate on H.B. 2048's alleged downstream effects. Its analysis hinged on a "pizza parlor" analogy meant to show that H.B. 2048 effectively reduces the price of goods manufacturers sell to non-covered entities. J.A. 114. But that analogy rested on a misinterpretation of H.B. 2048. In the district court's version, Congress required pizza parlors to sell discounted pizzas to people named John, and H.B. 2048 forced those parlors to also provide the discount to "any other person that John sold them to." *Id.* That framing is mistaken. H.B. 2048 does not expand the list of entities entitled to purchase discounted drugs. Federal law limits that list to covered entities. 42 U.S.C. § 256b(a)(4). And pharmacies are not covered entities. *Id.* In other words, H.B. 2048 does not require the sale of pizzas to *any* non-Johns. The court stretched the concept of "effectively" much too far.

A more fitting analogy would involve a federal law requiring pizza parlors that voluntarily participate in the program to offer discounted pizzas to certain businesses, who may only use those pizzas to feed employees. If parlors only allowed businesses to have discounted pizzas delivered to company headquarters, H.B. 2048 functions like a

summary judgment to Arkansas), *aff'd* 95 F.4th 1136 (8th Cir. 2024), *cert. denied*, 145 S.Ct. 768 (2024); *but see AstraZeneca Pharms. LP v. Harris,* No. 4:24-cv-00268-KGB (E.D. Ark. Sept. 30, 2025), ECF No. 141 (denying judgment on the pleadings in Arkansas); *PhRMA v. Morrisey*, 760 F. Supp. 3d 439, 452–60 (S.D.W. Va. 2024) (granting preliminary injunction in West Virginia).

state law that requires delivery to other company sites or directly to remote employees' homes. The discount remains the same, but the delivery options for employees are expanded. That is all H.B. 2048 does. It does *not* require pizza parlors or businesses to deliver pizza to anyone, anywhere, at any time.

Nevertheless, the court held that requiring manufacturers to deliver the covered entities' drugs to pharmacies "effectively expands the definition of 'covered entity' to include contract pharmacies," which conflicts with federal law. J.A. 116 (citation omitted). But as the Eighth and Fifth Circuits have already explained, "[t]his misconstrues what [the law] does." *McClain*, 95 F.4th at 1144; *see also Fitch*, 152 F.4th at 647; *Murrill*, 2026 WL 350685, *6. H.B. 2048 "does not expand Section 340B's list of covered entities to include contract pharmacies." *Fitch*, 152 F.4th at 647. It merely requires "drug manufacturers to give custody of discounted drugs to contract pharmacies only insofar as they have partnered with covered entities to distribute the drugs to patients." *Id.* That's it.

Below, AstraZeneca argued that H.B. 2048's definition of "340B entity" means that "340B pricing must be made available to contract pharmacies themselves." J.A. 73. To be sure, for purposes of Oklahoma's law a "340B entity" includes a covered entity's contract pharmacy, OKLA. STAT. tit. 36, § 5401(2), but that is only the case when that pharmacy is operating in the capacity of a contract pharmacy for a particular covered entity, *id.* That does *not* mean that the pharmacy itself may purchase drugs at the discount price, disconnected from the covered entity. Again, "covered entities" and

"340B entity" are not the same term. And although it is true that HB 2048 forbids manufacturers from "restrict[ing]" a "340B entity" from *receiving* a "340B drug," the Act defines "340B drug" in a way that prohibits pharmacies from *purchasing* drugs at the 340B discount. *Id.* §§ 5401(1), 5403(A). Specifically, "340B drug" is defined to only include drugs "purchased by a covered entity." *Id.* § 5401(1). The only entities that can access the 340B discount are those permitted by federal law to purchase drugs at those prices. Under the statute, therefore, "[p]harmacies do not purchase 340B drugs, and they do not receive the 340B price discounts." *McClain*, 95 F.4th at 1144. Similarly, the Fifth Circuit held that a similar state statute "does not compel manufacturers to 'offer' discounted drugs to contract pharmacies." *AbbVie*, 152 F.4th at 647. AstraZeneca is wrong as a matter of law on this critical point. There is no conflict here.

The district court failed to grapple with this precedent. Instead, the court relied on the only other district court—out of many—to enjoin a similar law. J.A. 115–16 (citing *Morrisey*, 760 F. Supp. 3d at 455). That decision, now on appeal, was erroneous. It faulted other courts for ignoring the "replenishment model" when denying manufacturers' requests for temporary injunctions*, id.*, even though several district courts expressly considered the replenishment model before rejecting the manufacturers' claims, *see, e.g.*, *Skrmetti*, 2025 WL 1805271, at *5–7; *AbbVie Inc. v. Fitch*, No. 1:24-cv-184, 2024 WL 3503965, at *13–14 (S.D. Miss. July 22, 2024).

But more fundamentally, the replenishment model lacks relevance, for reasons already described. H.B. 2048 says nothing about the replenishment model but instead

speaks to delivery, whether that delivery happens before or after a drug is dispensed. *See Fitch II*, 2024 WL 3503965, at *13–14. Consider a pharmacy and covered entity that decline to use the replenishment model. There, the entity purchases the drugs from the manufacturer and has them shipped to the pharmacy. Upon receipt, the pharmacy dispenses the drug to entity patients. There can be no question, there, that H.B. 2048's requirement that the manufacturer send drugs to the pharmacy is regulating delivery.

Swap in the replenishment model and nothing changes. The only difference is timing: the drug is replenished after the pharmacy has dispensed the drug to entity patients. In both scenarios, "[t]he amount of the discount is not at issue and is not affected by the state scheme." *Skrmetti*, 2025 WL 1805271, at *18 (rejecting a manufacturer's replenishment argument because a similar state law merely "impos[ed] restrictions on where [the manufacturer] is *willing* to deliver drugs"). Oklahoma law only requires that manufacturers deliver the drugs to pharmacies.

Whether the replenishment model is wise or permitted within the Program is a question for the federal government. AstraZeneca's replenishment quarrel is with Congress and federal regulators, not Oklahoma. If Congress banned the replenishment model tomorrow, Oklahoma's law would operate exactly the same. *AbbVie Inc. v. Bailey*, No. 4:24-cv-996, 2025 WL 1918948, at *8 (E.D. Mo. July 11, 2025). This reality underscores the absence of conflict between the two laws. The district court, however, did not address this point. Nor did the court limit relief to the replenishment model, as it should have if that model mattered for preemption purposes.

Rather, the district court focused on the alleged "artificiality" of the term "340B drug." J.A. 114. H.B. 2048 defines a 340B drug as a drug that has been purchased by a covered entity through 340B. OKLA. STAT. tit. 36, § 5401(1). The court concluded that because price determines whether a drug falls within the definition, the statute must somehow be regulating price. But this ignores what the law actually does. It "does not set or enforce discount pricing." *McClain*, 95 F.4th at 1145. Instead, the law imposes delivery conditions on drugs already purchased at the 340B price. *Id.* It is regulating conduct, not price. *Murrill*, 2026 WL 350685, at *7. Price serves only as a condition precedent to delivery obligations. And that use of price is logical given that manufacturers have singled out 340B-discounted drugs for delivery restrictions. The law prohibits that conduct but does not alter the 340B price one iota. *Skrmetti*, 2025 WL 1805271, at *18 ("The amount of the discount is not at issue and is not affected by the state scheme."). As the Fifth Circuit held, the law "prohibits manufacturers from interfering with the 'acquisition' by—or 'delivery' to—a 'pharmacy that is under contract with a 340B entity.'" *Id.* (quoting Louisiana law). The district court's conclusion that anything even remotely connected to price is a price regulation is simply wrong. *Cf. United States v. Skrmetti,* 605 U.S. 495, 512 (2025) ("This Court has never suggested that mere reference to sex is sufficient to trigger heightened scrutiny.").

Nor does H.B. 2048 interfere with the "delicate balance" of the Program, as the district court claimed. J.A. 116. In the court's telling, Congress's silence on delivery means that any state law imposing burdens on manufacturers conflicts with federal law.

But the court supported this conclusion by relying on a district court decision that mistakenly assumed that the 340B Program possesses "twin federal purposes" of "providing discounts to covered entities only *and* prohibiting fraud through duplicate discounts." *Morrisey*, 760 F. Supp. 3d at 452. But the purpose of the Program is to subsidize covered entities to "stretch scarce Federal resources as far as possible." H.R. REP. NO. 102-384(II), at 12; *Frey*, 2026 WL 184504, at *9 ("The 340B Program is designed to use two other large federal spending programs to incentivize manufacturers to provide a subsidy to healthcare entities caring for underserved patients."). That is all. To be sure, Congress enacted safeguards to prevent abuse. But the goal of preventing abuse is not equal in weight to the reason the Program was enacted in the first place. That goal is only a "subsidiary goal[] to the objective of the 340B program, which is to subsidize the cost of drugs to underserved populations." *Frey*, 2026 WL 184504, at *9 n.10. Every federal program, after all, has protections against waste and fraud. *Id.*

Worse, the district court's analysis flipped the analysis on its head. As this Court has made clear, "congressional silence will not be presumed to mandate preemption." *Paul v. Monts*, 906 F.2d 1468, 1475 n.8 (10th Cir. 1990) (per curiam). Thus, "it will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intent to do so." *Id.*; *see Planned Parenthood of Indiana, Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 985 (7th Cir. 2012) ("congressional and regulatory silence usually defeats a claim of preemption, not the other way around") That principle applies with increased force here, where the

statute falls squarely within Oklahoma's broad authority to "regulat[e]" matters of "health and safety." *Hillsborough Cnty.*, 471 U.S. at 719; *see also Fitch*, 152 F.4th at 646 ("H.B. 728 implicates two traditional general areas of state regulation and police power: public health and consumer protection."). Simply put, Congress's silence on contract pharmacies and drug distribution "do not imply that Congress intended to confer on manufacturers a right to be free from all state law requirements regarding drug distribution to patients, delivery of a covered entity's property to contract pharmacies, and collection of claims data." *Frey II*, 2026 WL 184504, at *15.

And though Congress undoubtedly sought to balance interests in creating the Program, part of that balance "involved allocating authority between the Federal Government and the States." *Murrill*, 2026 WL 350685, at *7 (citation omitted). Congress chose not to regulate the delivery of drugs. *Id.* Given the importance of contract pharmacies at the time the Program was enacted—and amended—"Congress was aware of the role of pharmacies and state pharmacy law in implementing 340B." *McClain*, 95 F.4th at 1144. This was a conscious choice to preserve State authority. Indeed, in its 1996 guidance on the use of contract pharmacies, HRSA acknowledged that state law plays a role in governing covered entities' use of outside pharmacies. 61 Fed. Reg. at 43,549, 43550 (August 23, 1996) (stating that its contract pharmacy guidance did not "create new rights but rather [was] simply recognizing an existing right that covered entities enjoy under State law"). There is no clear and manifest purpose here by Congress to remove State authority. The court below was wrong, and the

numerous other courts that ruled in the opposite direction are correct. *See, e.g.*, *McClain*, 95 F.4th at 1144; *Murrill*, 2026 WL 350685, at *7; *Fitch*, 152 F.4th at 646; *Frey*, 2026 WL 184504, at *14, *Weiser I*, 2025 WL 3041825, at *9–12.

**ii. H.B. 2048's enforcement does not conflict with the Program.**

The district court also relied on *Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110 (2011), to hold that Oklahoma seeks to "enforc[e] the 340B Program itself," which contradicts the Program's centralized enforcement. J.A. 117. This is incorrect.

*Astra* analyzed whether a covered entity could sue manufacturers for overcharging. 563 U.S. at 113. The plaintiff conceded that the statute provided no private right of action for covered entities to sue on this basis. *Id.* But the plaintiff alleged that it could sue as a third-party beneficiary to the agreement between HHS and the manufacturer setting the 340B price. *Id. Astra* disagreed. Because the statute did not grant a private cause of action, HHS's enforcement process was deemed the exclusive means to enforce the 340B price. *Id.* at 120. *Astra* does not stand for the proposition that all decisions remotely touching on the Program must be made by HHS. *Fitch*, 152 F.4th at 647–48. Instead, it recognized only that Congress created an "adjudicative framework ... for covered entities complaining of '*overcharges* and other violations of the discounted *pricing requirements*.'" *Astra USA*, 563 U.S. at 122 (quoting 42 U.S.C. § 256b(d)). *Astra* did *not* deal with preemption, at all. And H.B. 2048 "does not intrude upon this authority because it does not impose penalties for violations of Section 340B, like failing to offer discounted drugs to covered entities or engaging in diversion." *Fitch*,

152 F.4th at 647–48; *see also Fitch I*, 2024 WL 3277365, at *12 ("The Supreme Court's rejection [in *Astra*] of a right of action for covered entities ... has minimal bearing on whether Section 340B preempts state law about the delivery of 340B drugs.").

There is no enforcement overlap here—precluding preemption. *Crosby v. Nat. Foreign Trade Council*, 530 U.S. 363, 380 (2000) ("Conflict is imminent when two separate remedies are brought to bear on the same activity.") (citation modified). The Program regulates discount pricing. So HHS has jurisdiction over "disputes between covered entities and manufacturers regarding pricing, overcharges, refunds, and diversion of 340B drugs to those who do not qualify." *McClain*, 95 F.4th at 1144. In contrast, H.B. 2048 ensures that covered entities can use pharmacies for delivery, which federal law is silent about. These realms are separate. *Id.* As the Fifth Circuit explained, if a covered entity believes a manufacturer is charging more than the 340B price, H.B. 2048 provides no recourse. *Fitch*, 152 F.4th at 647–48. H.B. 2048 steps in only "when drug manufacturers ... interfer[e] with the distribution of Section 340B drugs." *Id.* at 648; *see also Murrill*, 2024 WL 4361597, at *8 (noting that a similar statute "pertains solely to pharmaceutical companies' actions toward pharmacies who enter into contracts with covered entities under the Section 340B program"). And if a manufacturer refuses to deliver drugs to a pharmacy, "'only the [state] Act provides recourse' because § 340B is silent on delivery logistics." *Murrill*, 2026 WL 350685, at *6 (citation omitted). As such, H.B. 2048's enforcement will involve different subject matter than 340B "and cannot be said to conflict with it." *Fitch*, 152 F.4th at 648; *see also Murrill*, 2026 WL 350685, at

*6 ("The two regimes operate in distinct spheres."). At bottom, H.B. 2048's penalties are "aimed at activity that falls outside the purview of 340B." *McClain*, 95 F.4th at 1145; *see also Frey*, 2026 WL 184504, at *14 ("Federal violations like overcharging and diversion are not enforced by a similar state statute.").

Were all that not enough, again, *Astra* did not involve preemption. Nor did it apply any presumption analogous to the presumption against preemption applicable here. *Fitch*, 152 F.4th at 648. Therefore, even if *Astra* were somehow relevant, its applicability would be limited. After all, because the State has traditionally occupied health, safety, and pharmacy fields (as well as consumer protection), the "congressional intent to supersede state laws must be clear and manifest." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (citation modified).

Without grappling with the appellate courts that have decided differently, the district court asserted that any disputes related to the delivery of a 340B drug under H.B. 2048 "necessarily raise a question as to whether the covered entity or contract pharmacy was delivered drugs at the discounted rate." J.A. 120. The Fifth Circuit rejected this type of "circular reasoning" on the grounds that the law "does not regulate prices; it regulates conduct." *Murrill*, 2026 WL 350685, at *7. For example, if a manufacturer believes that a covered entity has engaged in diversion, "only the 340B statute provides recourse ... and [Oklahoma's law] has nothing to say about it." *Id.* at *6; *see also Fitch*, 152 F.4th at 647 (a similar state statute "does not intrude upon [HHS's] authority because it does not impose penalties for violations of Section 340B"). On the

other hand, if a manufacturer refuses to deliver discounted drugs to a covered entity's contract pharmacy, "only [the law] provides recourse." *Id.* (citation omitted). Federal law is indifferent. The policies that triggered the passage of H.B. 2048 elucidate the separate spheres of enforcement.

After conflating enforcement of H.B. 2048 with enforcement of the Program, the district court asserted that there were "non-speculative concerns" about the possibility of state adjudicators providing interpretations of federal law that conflict with federal regulators. J.A. 120. This concern is illusory. "The two regimes operate in distinct spheres." *Murrill*, 2026 WL 350685, at *6. State adjudicators will not be asked to interpret federal law when applying H.B. 2048. The court misunderstood how the law operates. For example, it was flatly wrong that state enforcement will turn on questions of patient eligibility. J.A. 120. The law only applies to "340B drugs," which are defined as drugs "that ha[ve] been subject to any offer for reduced prices" pursuant to the Program "and purchased by a covered entity." OKLA. STAT. tit. 36, § 5401(1). By its text, the law only requires a manufacturer to deliver to pharmacies the drugs that it has already offered to the covered entity at the 340B discount.

To be sure, there may be times when a manufacturer later believes a particular transaction should not have been subject to the 340B discount. Maybe, for example, the manufacturer believes that the final recipient of the drug should not be considered a patient of the covered entity. In that scenario, H.B. 2048 provides no recourse. Section 340B's anti-diversion provisions are enforced either by HRSA directly or after the fact

through the ADR process. 42 U.S.C. §§ 256b(d)(2)(B)(v) & (3). A manufacturer may not refuse to sell—or deliver—340B drugs because it merely suspects diversion. If it refuses to do so, it will have violated federal law. Rather, the proper method is to pursue adjudication through the ADR process. And as the drug was already purchased at the 340B discounted price, the manufacturer was required to honor the delivery choice.

Practically speaking, enforcement of H.B. 2048 will not involve a drug-by-drug analysis, much less a price analysis. The published manufacturer policies that triggered H.B. 2048 state that manufacturers will not deliver to contract pharmacies the 340B-discounted drugs that covered entities purchase. J.A. 64–65. Such policies clearly violate Oklahoma law and enforcement would not require interpreting federal law. These manufacturer policies are blunt instruments. They either allow distribution to contract pharmacies or they do not. Any disputes between covered entities and manufacturers over particular prescriptions or topics such as diversion, overcharging, or patient eligibility will be resolved through the federal ADR process.

**iii. H.B. 2048's prohibition against requiring claims data does not conflict with federal law.**

H.B. 2048 prohibits manufacturers from conditioning the delivery or purchase of 340B drugs on the provision of claims data from covered entities and pharmacies. OKLA. STAT. tit. 36, § 5403(A), (B). The law also provides that nothing in it should be construed to conflict with federal law. *Id.* § 5405. Taken together, this prohibits manufacturers from requiring any claim data *not required by federal law*. The district court

held that this prohibition conflicted with federal law by "inhibiting [manufacturer's] ability to access the 340B Program's ADR Process." J.A. 118.

Before a manufacturer accesses the ADR process it must receive permission from HHS to conduct an audit. But the court was mistaken in concluding that H.B. 2048 stands in the way of manufacturers' requests. That is because the standard for an audit is low. When manufacturers wish to audit a covered entity, they must demonstrate only "reasonable cause," defined broadly to mean that a reasonable person could believe an entity may have violated a statute. Manufacture Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg., 65,406, 65,409 (Dec. 12, 1996). This standard is "not overly burdensome[,]" *Skrmetti*, 2025 WL 1805271, at *15, and can be met by "[s]ignificant changes in quantities of specific drugs ordered by a covered entity" or "complaints from patients/other manufacturers about activities of a covered entity." 61 Fed. Reg. at 65,406. On top of that, AstraZeneca's concern is speculative. It has not provided any example of HHS denying a manufacturer an audit, much less because of a lack of claims data. *Skrmetti*, 2025 WL 1805271, at *16; *Weiser*, 2025 WL 3653161, at *10; *Frey I*, 2025 WL 2813787, at *12; *Frey II*, 2026 WL 184504, at *14.

The district court waved these responses away by asserting that without claims data it would be "impossible" to detect diversion. J.A. 118–19. As support, the court cited a different manufacturer's employee's opinion in a different case that it would be impossible. *Id.* But even ignoring the tension between this citation and the court's statement that the issues here are purely legal, Doc. 98, *AbbVie v. Drummond*, No. 5:25-

cv-726 (W.D. Okla.), given the lax "reasonable cause" standard, manufacturers do not need precise claims data in order to realize that a covered entity has—for example—recently increased the number of drugs it has purchased.

More fundamentally, the district court's conclusion is mistaken because the Program has never required covered entities to provide claims data to manufacturers and "yet the ADR system has nonetheless been in place and functioning adequately for many years in the absence of any such requirement." *Skrmetti*, 2025 WL 1805271, at *16. If Congress or HRSA thought claims data was necessary to access the ADR process, they would have provided for it. Regardless, given the speculative nature of AstraZeneca's claims on this subject, the district court erred in granting sweeping pre-enforcement relief to AstraZeneca. If in the future AstraZeneca can establish that it needs claims data in a particular instance to fulfill federal law, that would potentially provide the basis for an as-applied challenge, but not the facial relief it received here.

## II. The district court erred by granting an injunction before the State had an opportunity to oppose AstraZeneca's motion.

AstraZeneca filed its Complaint on October 3, 2025. J.A. 8. On October 10, it filed its motion for a preliminary injunction with an accompanying brief in support. J.A. 49. According to the Local Rules for the Western District of Oklahoma, the State's response in opposition was due October 31, LCvR7.1(g), and the court did not alter that deadline. Prior to AstraZeneca's action, two other drug manufacturers filed separate lawsuits in the same court challenging the constitutionality of H.B. 2048. *See*

*AbbVie, Inc. v. Drummond*, No. 5:25-cv-726 (W.D. Okla.); *Novartis Pharms. Corp. v. Drummond*, No. 5:25-cv-727 (W.D. Okla.). In each of those cases, the State filed responses and the court heard oral argument. On October 31—as the State was finalizing its response to AstraZeneca's motion for an injunction—the district court entered its order granting all three manufacturers (including AstraZeneca) a preliminary injunction. The court had not consolidated the cases, and the injunction was granted before the State had an opportunity to respond to AstraZeneca's brief. That was error.

Again, a preliminary injunction is "an extraordinary remedy" that courts "never award[] as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Here, the district court short-circuited that process. It granted "extraordinary relief" before the State responded to AstraZeneca's motion for a preliminary injunction. That procedural error alone warrants reversal.

The structure of the judicial system "runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974). It is "fundamental" that "an opportunity to be heard" must be granted "in a meaningful manner." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972). Federal Rule of Civil Procedure 65 requires that a preliminary injunction issue only "on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). The Supreme Court has long held that this notice requirement "implies a hearing in which the defendant is given a fair opportunity to oppose the application and prepare for such

opposition." *Granny Goose Foods, Inc.*, 415 U.S. at 432 n.7 (1974). And this Court has emphasized that "[p]reliminary injunctions entered without notice to the opposing party are generally dissolved." *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1253 (10th Cir. 2006); *cf. Tripati v. Beaman*, 878 F.2d 351, 354 (10th Cir. 1989) (holding that before a court imposes filing restrictions on an abusive litigant the litigant "is entitled to notice and opportunity to oppose the court's order"). This practice is supported by the strict limitations that Congress has placed on granting equitable relief before the defendant has had the opportunity to defend itself. For example, a TRO may only be issued without notice to the adverse party after a showing of "specific facts" that "clearly show that immediate and irreparable injury, loss, or damage will result" before the defendant can be heard. Fed R. Civ. P. 65(b)(1)(A). Even if the court is satisfied that such irreparable harm exists, the TRO only lasts 14 days. *Id.* 65(b)(2). The district court thus afforded AstraZeneca greater relief—an indefinite preliminary injunction—with fewer procedural protections than Rule 65 requires for even a fourteen-day TRO.

Here, the State did not have the opportunity to present arguments in opposition to AstraZeneca's motion. To be sure, the State was aware that AstraZeneca had moved for a preliminary injunction. Indeed, counsel for the State had spent weeks preparing its response in opposition that was due October 31. But by granting AstraZeneca an injunction prior to the State filing its brief, the district court denied the State the opportunity to be heard. *Granny Goose*, 415 U.S. at 432 n.7; *In re Lane*, 726 F. Supp. 3d 1305, 1317 (D. Wyo. 2024) ("Appellant was entitled to notice and opportunity to

oppose the potential injunction."). The district court had not consolidated this case with the other challenges to H.B. 2048, nor had it notified the State that it planned on issuing an order in this case prior to the State's October 31 deadline. By acting without warning in granting the injunction before the State had an opportunity to be heard, the district court effectively granted an ex parte preliminary injunction. This decision contravenes Rule 65(a) and longstanding precedent. This Court should reverse.

## III. The district court improperly weighed the remaining injunction factors.

The preliminary injunction is irreparably harming the State, its citizens, and the public interest. Blocking a "duly enacted [state law] clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). The harm is especially severe here because H.B. 2048 serves significant public interests, protecting health and safety.

Enjoining H.B. 2048 irreparably harms the State's vulnerable populations and hospitals. *See, e.g.*, Alaa Ziad Haidar, *Recent 340b Contract Pharmacy Troubles and the Necessary Solution*, 33 Health L. 34, 34 (2020) (describing the benefits of contract pharmacies). As the Supreme Court put it, "340B hospitals perform valuable services for low-income and rural communities but have to rely on limited federal funding for support." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 738 (2022). That citation alone shows the need for pharmacy access that H.B. 2048 promotes. In 2017, 74 percent of rural hospitals reported that they used savings from the 340B Program to keep their doors

open.[7] Again, Congress created the Program because it was unwilling to "continue to allow" these vulnerable populations "to remain unprotected against manufacturer price increases." H.R. REP. 102-384, at 11. But as the federal government itself has acknowledged, if covered entities are not able to use pharmacies, they will face the "untenable dilemma" of choosing to invest in in-house pharmacies—"impossible" for many—or leaving the Program. Notice Regarding Section 602, 61 Fed. Reg. 43,549, 43,550. Moreover, HRSA has emphasized that limiting covered entities to one contract pharmacy caused, among other things, patients to experience "transportation barriers" in filling prescriptions. Notice Regarding 340B, 75 Fed. Reg. 10,272, 10,273. The federal government and state agree on this.

H.B. 2048 assists the Program in realizing its goals "to stretch scarce Federal resources as far as possible." *Id.* at 12. The increased funds stemming from H.B. 2048 allow for an increased health care capacity. *See* 1996 HHS Guidance at 43,549 ("savings realized from participation ... increase the number of patients whom they can subsidize and expand services and formularies"). Covered entities might be able to offer additional services that they would otherwise not be able to offer. *See Fitch II*, 2024 WL 3503965, at *11 (the 340B Program "incentivize[s] providers to provide certain kinds of care by ensuring they can obtain drugs for their patients at discounted prices").

[7] 340B INFORMED, *Keeping Rural Hospitals Open is a Key Part of 340B* (Mar. 7, 2019), https://tinyurl.com/340Binformed (last accessed Feb. 18, 2026).

Indeed, the Eighth Circuit recognized that restrictions on the use of contract pharmacies "caused covered entities dependent on contract pharmacies to become unable to serve patients in need." *McClain*, 95 F.4th at 1139. And the Fifth Circuit noted that a similar state law "further[ed] 'important public interests'" by "expand[ing] needy patients' access to care and giv[ing] covered entities better ability to expand and improve their services." *Fitch*, 152 F.4th at 644 (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485–86 (1987)). As the law's authors stated, allowing restrictions on the delivery of 340B drugs to contract pharmacies would "undermine[] protections for essential medical services, including cancer treatments and obstetrical care, across [the] state."[8] OKLA. HOUSE OF REPRESENTATIVES, Stinson, Howard Comment on Governor's Veto of Bill to Protect Rural Health Care, May 21, 2025.[9]

The district court's irreparable harm analysis rested on its conclusion that H.B. 2048 violated the Constitution. J.A. 124–25. That conclusion is faulty and falls with a reversal. The court also noted that AstraZeneca was potentially subject to criminal penalties for violations of the law, but this is bizarre given that AstraZeneca has not credibly argued that it will likely face criminal penalties. The law authorizes exclusively civil penalties. OKLA. STAT. tit. 36, § 5404. AstraZeneca's citation to a different statute within the Oklahoma Insurance Code that states that "violation of any provision of this Code shall constitute a misdemeanor[,]" *id.* § 117, does not transform this civil statute

---

[9] *Available at* https://www.okhouse.gov/posts/news-20250521_1.

into a criminal one. Among other things, AstraZeneca has not cited "any instances in which criminal charges were brought against a corporation for violation of the [Oklahoma Insurance Code]." *Skrmetti*, 2025 WL 1805271, at *10. And at the hearing, the State emphasized that it could not file criminal charges for violations.

AstraZeneca has also complained that HB 2048 will cost millions of dollars. But the law does not require AstraZeneca to provide discounted prices. Any harm from the discounts would stem from the Program itself—which, along with the replenishment model, is where AstraZeneca's real complaint appears to lie. And whatever compliance costs AstraZeneca alleges will result from HB 2048 are outweighed by the benefits they receive from the Program. In any case, the harm to the State and public outweighs AstraZeneca's hypothetical financial costs.

## CONCLUSION

The district court's decision to grant a preliminary injunction was erroneous. H.B. 2048's requirement that drug manufacturers deliver 340B drugs to contract pharmacies is not preempted by a federal program that is silent about delivery. This Court should reverse.

## STATEMENT REGARDING ORAL ARGUMENT

Oklahoma supports oral argument in this case. The 340B Program and H.B. 2048 regulate in areas that are admittedly esoteric and complex, and further questioning and development would likely assist this Court in issuing a decision. Moreover, a

preemption finding by its nature is a question of federalism, and such questions are important and worth in-depth consideration and oral argument.

Respectfully submitted,

*s/Will Flanagan*
GARRY M. GASKINS, II
*Solicitor General*
ZACH WEST
*Director of Special Litigation*
WILL FLANAGAN
*Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
William.Flanagan@oag.ok.gov
*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This response complies with the typeface requirements of Fed. R. App. P. 32 because it was prepared in a proportionally spaced font (Garamond, 14-point) using Microsoft Word 2016. The document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i), because it contains 12,037 words, excluding the parts exempted.

s/ *Will Flanagan*
WILL FLANAGAN

## CERTIFICATE OF DIGITAL SUBMISSION

All required privacy redactions have been made as required by 10th Cir. R. 25.5 and the ECF Manual. Additionally, this filing was scanned with the most updated Crowdstrike antivirus software.

s/ *Will Flanagan*
WILL FLANAGAN

## CERTIFICATE OF SERVICE

I certify that on September 19, 2024, I caused the foregoing to be filed with this Court and served on all parties via the Court's CM/ECF filing system.

s/ *Will Flanagan*
WILL FLANAGAN

# ATTACHMENT 1

Order [Dkt. #27]
District Court Order Granting
Motion for Preliminary
Injunction Filed 10/29/2025

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| ABBVIE INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>GENTNER DRUMMOND, in his official capacity as ATTORNEY GENERAL,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. CIV-25-726-PRW |
| NOVARTIS PHARMACEUTICALS COPRORATION,<br><br>Plaintiff,<br><br>v.<br><br>GENTNER DRUMMOND, in his official capacity as ATTORNEY GENERAL,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. CIV-25-727-PRW |
| ASTRAZENECA PHARMACEUTICALS LP<br><br>Plaintiff,<br><br>v.<br><br>GENTNER DRUMMOND, in his official capacity as ATTORNEY GENERAL, *et al.*<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. CIV-25-1156-PRW |

# ORDER

Before the Court are three motions for preliminary injunction (Case No. CIV-25-726, Dkt. 7; Case No. CIV-25-727, Dkt. 15; and Case No. CIV-25-1156, Dkt. 13). Plaintiffs AbbVie Inc., *et al.*, Novartis Pharmaceuticals Corporation, and AstraZeneca Pharmaceuticals LP each moved for a preliminary injunction under Federal Rule of Civil Procedure 65. Defendant Gartner Drummond, in his official capacity as Attorney General of Oklahoma, filed responses in opposition to AbbVie and Novartis's Motions. For the reasons that follow, Plaintiffs' Motions are **GRANTED IN PART AND DENIED IN PART**.

## *Background*[1]

In 1992, Congress created what would become the most important drug pricing scheme virtually no one has heard of: the 340B Program. The 340B Program, unlike Medicare and Medicaid, was designed for the direct benefit of healthcare providers rather than their patients.[2] Indeed, a patient would generally have no reason to know that the 340B Program played any role in their prescription. The patient pays the same price, for the same drug, from the same pharmacy as they would if their prescription wasn't covered by the 340B Program.

Congress enacted the 340B Program as part of the Veterans Health Care Act to help qualifying healthcare providers ("covered entities") stay afloat by allowing them to

[1] Unless otherwise noted, the information in this section is drawn from the uncontested statements of facts in the parties' pleadings.

[2] *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3rd Cir. 2023).

purchase certain outpatient drugs from manufacturers who participate in Medicaid and Medicare Part B at a discount negotiated by the Secretary of Health and Human Services.[3] The 340B Program requires drug manufacturers to subsidize covered entities by forcing the drug manufacturers to sell deeply discounted drugs to those entities, who then turn around and sell them to their patients at full price and pocket the difference. And when those covered entities bill their patients' insurance providers for qualifying 340B drugs, the insurance companies reimburse the covered entities at the non-discounted price, and again, the covered entities pocket the spread. Covered entities are not obligated to pass any of this windfall on to patients. They are free to do whatever they like with it, whether that be putting the profits towards general operating expenses or new capital projects.

There are sixteen different categories of covered entities, ranging from Disproportionate Share Hospitals ("DSHs"), which essentially are non-profit or public hospitals serving high numbers of Medicare or Medicaid recipients,[4] to Indian health centers and Ryan White HIV/AIDS Program grantees.[5] Commercial pharmacies are not covered entities.

The Health Resources and Services Administration ("HRSA"), an agency of the United States Department of Health and Human Services ("HHS"), administers the

---

[3] *Sanofi*, 58 F.4th at 699–700.

[4] Health Res. & Servs. Admin., *Disproportionate Share Hospitals: Eligibility*, U.S. Dep't of Health & Hum. Servs., https://www.hrsa.gov/opa/eligibility-and-registration/hospitals/disproportionate-share-hospitals (last visited Oct. 9, 2025).

[5] Health Res. & Servs. Admin., *340B Eligibility: Who Can Participate in the 340B Drug Pricing Program*, U.S. Dep't of Health & Hum. Servs., https://www.hrsa.gov/opa/eligibility-and-registration (last visited Oct. 9, 2025).

program. Initially, the covered entities were distributing 340B drugs from their inhouse pharmacies, but in 1996, acknowledging that not every covered entity could support a pharmacy, HRSA allowed each covered entity to begin working with one outside "contract pharmacy" (think Walgreens or CVS), so long as the covered entity did not transfer title to any discounted drugs to the contract pharmacy.[6] In 2010, HRSA allowed covered entities to begin contracting with an *unlimited* number of contract pharmacies for purposes of 340B prescription fulfillment.[7]

After that 2010 change, the average number of contract pharmacies engaged with each covered entity began to rapidly rise, reaching 20.7 by 2024.[8] Coinciding with the relaxed rules around contract pharmacies, covered entities themselves began proliferating.[9] Offshoots of covered entities, such as separately located urgent care centers, are in some cases deemed "child sites" and eligible for 340B pricing.[10] These child sites, it turns out, are often not located in socioeconomically challenged areas.[11] As of 2023, only 30% of 340B-eligible child sites are located in counties with either poverty rates higher than Oklahoma's statewide poverty rate or with median incomes lower than the state's median income.[12] Meanwhile, 52% of 340B-eligible hospitals and federal grantees are located in

---

[6] 61 Fed. Reg. 43549, 43551–53 (Aug. 23, 1996).

[7] 75 Fed. Reg. 10272, 10273 (Mar. 5, 2010).

[8] Chen Expert Rep. (Case No. CIV-25-726, Dkt. 7, Ex. 24), at 20.

[9] *Id.* at 19.

[10] *Id.* at 6.

[11] *Id.* at 30.

[12] *Id.* at 37.

such counties.[13] Further, covered entities are no longer contracting with just local pharmacies. The University of Oklahoma Medical Center, for example, has its 340B-discounted drugs shipped to contract pharmacies in far-flung places like Orlando, Florida; Las Vegas, Nevada; and Carolina, Puerto Rico.[14]

Unsurprisingly, this proliferation attracted third parties looking to share in the profits from the rapidly growing 340B market. A cottage industry of "third-party administrators" began offering their services to covered entities to cull through records from prescription sales by contract pharmacies to match those sales up with possible 340B eligibility.[15] Then, the covered entities purchase drugs from the manufacturers that are delivered to the contract pharmacies at 340B prices to backfill the inventory depleted as a result of qualifying 340B customer sales. The new inventory of drugs purchased at 340B prices is comingled with the rest of the inventory not purchased through the 340B Program. The contract pharmacies, third-party administrators (often subsidiaries of the contract pharmacies), and the covered entities each divvy up the profits from the 340B sales.[16] This has been termed the "replenishment model." In 2023, Walgreens made $382 million dollars just through its third-party data processing subsidiary for administering the 340B

---

[13] *Id.*

14 Plf.s' Ex. 43 (Case No. CIV-25-726, Ex. 43), at 3–5.

[15] Chandra Expert Rep. (Case No. CIV-25-726, Dkt. 7, Ex. 25), at 42–43.

[16] *Id.*

Program.[17] What's more, fees accounting for as much as 20% of the reimbursements paid by insurers are paid out to the contract pharmacies.[18]

Drug manufacturers complained about what they perceived as a lack of transparency in the process by which these third-party administrators were identifying qualifying 340B prescriptions.[19] After all, part of the bargain Congress struck in creating the 340B Program was that manufacturers would be required to "offer" their drugs at a discounted price to the *covered entities,*[20] not their contract pharmacies.[21] And in exchange for offering that discount, the drug manufacturers could participate in Medicaid and Medicare Part B, but covered entities would not be able to double-dip and claim a Medicaid rebate from the manufacturer on top of the discounted price from the manufacturer.[22] Nor would covered entities be able to sell ("divert") the discounted drugs to patients not eligible to participate in the 340B Program.[23] The manufacturers complained that the lack of transparency in the replenishment model put them at a disadvantage by making it impossible for them to determine if double-dipping and diversion of discounted drugs was occurring. And some *was* occurring. Some 15% of HRSA audits had identified diversion violations, 6% had

---

[17] *Id.* at 42

[18] *Id.* at 42–43.

[19] Pl.s' Mot. Summ. J. (Dkt. 7), at 5–6.

[20] 42 U.S.C. § 256b(1).

[21] *Id.*

[22] 42 U.S.C. § 256b(a)(5)(A)(i).

[23] 42 U.S.C. § 256b(a)(5)(B).

identified double-dipped discounts, and almost 30% of HRSA audits had identified a combination of both.[24]

Congress responded to these complaints by granting both the HHS Secretary and manufacturers the ability to audit covered entities.[25] When an audit shows that a covered entity diverted discounted drugs or double-dipped on a discount and rebate, the covered entity can be required to pay a fine to the manufacturer or even face expulsion from the 340B Program or exclusion from Medicaid.[26] Further, Congress required that covered entities and manufacturers participate in administrative dispute resolution in the event they face disagreements over pricing, payment, diversion, or double-dipping with Medicaid rebates.[27] A prerequisite to ADR, however, is a manufacturer's audit of the covered entity.[28]

Drug manufacturers also began both limiting the number of contract pharmacies with which covered entities could engage for filling of 340B prescriptions and requiring certain claims data in exchange for transferring the 340B drugs to those contract pharmacies.[29] HHS moved to halt these efforts by the manufacturers, issuing an advisory

---

[24] Chen Expert Rep. (Case No. CIV-25-726, Dkt. 7, Ex. 24), at 29.

[25] 42 U.S.C. § 256b(a)(5)(C).

[26] 42 U.S.C. § 256b(d)(1).

[27] 42 U.S.C. § 256b(d)(3).

[28] 42 U.S.C. § 256b(d)(3)(B)(iv).

[29] These limitations imposed upon covered entities and contract pharmacies do not increase the prices *patients* pay for drugs. Remember, the patient and insurance company always pay normal market prices in the 340B Program—it's the covered entities who purchase the drugs at a discount and who are entitled to pocket the spread between the discounted purchase and sales prices. And unless a covered entity outright refused to write a

opinion prohibiting manufacturers from limiting contract pharmacy arrangements.[30] Drug manufacturers responded with lawsuits, and the Third Circuit and D.C. Circuit both ultimately sided with the manufacturers.[31] The Third Circuit held that the language of Section 340B does not require manufacturers to offer drugs to contract pharmacies at a discount. HHS relied on the silence of the statute to support its order, but the Third Circuit disagreed. "If drug makers make drugs available to anyone at any price, they must 'offer' those drugs to 'covered entities' at a discount."[32] The text of Section 340B does not contemplate contract pharmacies.[33] In light of this silence, the Third Circuit found that covered entities are not entitled to force manufacturers to "deliver goods wherever and to whomever the buyer demands."[34] The D.C. Circuit employed similar reasoning in its subsequent decision.[35]

In 2025, Oklahoma followed a slew of states that enacted legislation attempting to do what those federal courts had said HHS could not lawfully do. The Oklahoma Legislature enacted House Bill 2048 and overrode a governor's veto of its efforts. The

---

prescription for filling at a pharmacy from which it didn't reap a 340B profit, these manufacturer-imposed restrictions in no way make it harder for patients to get their prescriptions filled.

[30] HHS Advisory Opinion No. 20-06 (Dec. 30, 2020), https://tinyurl.com/2ca6rmnm.

[31] *Sanofi*, 58 F.4th at 696; *Novartis Pharmaceuticals Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024).

[32] *Sanofi*, 58 F.4th at 703.

[33] *Id.*

[34] *Id.*

[35] *Novartis,* 102 F.4th at 461.

relevant portion of the statute is codified at 36 O.S. § 5400 *et seq.*, which goes into effect on November 1, 2025. Oklahoma argues its law merely regulates *delivery* of drugs in a legislative void left by Congress's silence on the issue. Oklahoma fills that void by requiring manufacturers to deliver drugs at the 340B discount to as many contract pharmacies a covered entity wishes to designate. H.B. 2048 also creates its own enforcement scheme whereby violations of H.B. 2048 can result in both civil fines of up to $10,000 per violation and criminal sanctions. In short, H.B. 2048 expands drug manufacturer's obligations under the federal 340B program, which consequently raises a manufacturer's price of admission to participate in Medicaid and Medicare Part B.

AbbVie, Novartis, and AstraZeneca, in separate cases, now seek a preliminary injunction against H.B. 2048, arguing that it is constitutionally infirm.

***Analysis***

The purpose of a preliminary injunction is "to enjoin, pending the outcome of the litigation, action that [the movant] claims is unlawful."[36] A preliminary injunction is an "extraordinary remedy" that is never "awarded as of right."[37] An injunction is appropriate only when monetary or other traditional remedies are inadequate, and "the right to relief [is] clear and unequivocal."[38]

The Court may enter a preliminary injunction if (1) Plaintiffs are substantially likely to succeed on the merits; (2) Plaintiffs will suffer irreparable injury if the injunction is

---

[36] *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 314 (1999).

[37] *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).

[38] *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005).

denied; (3) Plaintiffs' threatened injury outweighs the injury Defendant will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.[39] "The third and fourth prongs 'merge when the Government is the opposing party.'"[40] As the movants, it is Plaintiffs' burden to establish that each factor tips in its favor.[41]

## I. Plaintiffs are substantially likely to succeed on the merits.

### a. H.B. 2048 is preempted.

The Constitution empowers Congress to pass legislation, as "the supreme Law of the Land[,]" preempting state law.[42] However, before courts determine that state law is preempted by federal law, courts presume that "the historic police powers of the States," are undisturbed by federal law, barring "the 'clear and manifest' intent of Congress."[43] In every question of preemption, then, "congressional intent [is] 'the ultimate touchstone[.]'"[44] Courts thus ascertain congressional intent either "'through a statute's express language" or infer it "'through its structure and purpose.'"[45]

---

[39] *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016).

[40] *Does 1-11 v. Board of Regents of University of Colorado*, 100 F.4th 1251, 1267 (10th Cir. 2024) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009).

[41] *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).

[42] *Bradshaw v. American Airlines, Inc.*, 123 F.4th 1168, 1173 (10th Cir. 2024) (citing *Arizona v. United States*, 567 U.S. 387, 399 (2012)).

[43] *Id.* at 1173 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

[44] *Id.* (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)).

[45] *Id.* (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)).

Preemption comes in different flavors,[46] but central to the claims here are theories of field and conflict preemption. Courts infer a statute is preempted under a theory of field preemption "where 'a framework of regulation' of a field is 'so pervasive' that it leaves no space for state supplementation or where the federal interest is 'so dominant' that the existence of a federal scheme can 'be assumed to preclude enforcement of state laws on the same subject.'"[47] Conflict preemption, on the other hand, "forces a state law to yield to federal law either when it is impossible to comply with both laws or when the state law thwarts the federal law's purposes and intended effects."[48]

**i. H.B. 2048's delivery requirement is preempted.**

It is undisputed that Congress did not expressly preempt H.B. 2048.[49] Instead, the Court must determine if H.B. 2048 is implicitly pre-empted.[50] Both in its briefs and at oral arguments, Oklahoma has asserted that H.B. 2048 is a "delivery" regulation, not a "pricing" regulation.[51] This matters because the Eighth Circuit recently relied on that distinction in concluding that a similar Arkansas law was not preempted by federal law.[52]

---

[46] *State of Kan. ex. rel. Todd v. United States*, 995 F.2d 1505, 1509 (10th Cir. 1993).

[47] *Bradshaw*, 123 F.4th at 1173 (quoting *Arizona*, 567 U.S. at 399).

[48] *Pharmaceutical Care Management Association v. Mulready*, 78 F.4th 1183, 1193 (10th Cir. 2023) (citing *Arizona*, 567 U.S. at 399–400).

[49] *ONEOK, Inc., v. Learjet, Inc.*, 575 U.S. 373, 376 (2015).

[50] *Id.*

[51] *See, e.g.,* Def.'s Resp. (Case No. CIV-25-726, Dkt. 26), at 11–12.

[52] *Pharmaceutical Research and Manufacturers of America v. McClain*, 95 F.4th 1136, 1139 (8th Cir. 2024).

Arkansas's law provides that:

> (c) A pharmaceutical manufacturer shall not:
> (1) Prohibit a pharmacy from contracting or participating with an entity authorized to participate in 340B drug pricing by denying access to drugs that are manufactured by the pharmaceutical manufacturer; or
> (2) Deny or prohibit 340B drug pricing for an Arkansas-based community pharmacy that receives drugs purchased under a 340B drug pricing contract pharmacy arrangement with an entity authorized to participate in 340B drug pricing.[53]

The Eighth Circuit echoed an observation from the Third Circuit that "the 340B Program 'is silent about delivery' and distribution of pharmaceuticals to patients."[54] The Eighth Circuit casts the Arkansas law as one that simply prohibits manufacturers from either "interfering in a covered entity's agreement with a contract pharmacy by denying the pharmacy access to a covered entity's 340B drugs[]" or "interfering in a covered entity's agreement with a contract pharmacy by denying 340B drug pricing to covered entities who use contract pharmacies for distribution."[55] Because, according to the Eighth Circuit, "[contract p]harmacies do not purchase 340B drugs, and they do not receive the 340B price discounts[,]"Arkansas's law is simply aimed at regulating pharmacy, a field traditionally within the province of a state's police power.[56] This supposed distinction between "delivery" and "price" regulations, however, strikes this Court as artificial.

---

[53] *Id.* at 1142–43 (quoting Ark. Code. Ann. § 23-92-604(c)).

[54] *Id.* at 1142 (quoting *Sanofi*, 58 F.4th at 703)).

[55] *Id.* at 1143.

[56] *Id.* at 1144.

First of all, how Oklahoma describes its regulation doesn't end the matter;[57] an examination of how the regulation actually operates is necessary. A hypothetical might help illustrate the point: imagine if Congress passed a law requiring pizza parlors to sell pizzas at a 50% discount to anyone named John. If a state then passed a law requiring those pizza parlors to also deliver half-priced pies to any other person that John told them to, could that state law possibly be described as a mere "delivery" regulation? Of course not; the effect of the law is to reduce the price of pies that would otherwise be sold to non-John's at full price. That's a law regulating pricing, and H.B. 2048 is just that kind of law.

And while the record is not yet clear whether the agreements between the covered entities and contract pharmacies in Oklahoma that participate in the 340B Program require the covered entities to maintain title in the 340B discounted drugs when they are at the contract pharmacies (Plaintiffs believe they don't), the practical effect either way is that H.B. 2048 requires manufacturers to deliver drugs to contract pharmacies at a discounted price when they would otherwise be delivered at full price. And why? Because Oklahoma wants drug manufacturers to maximally subsidize Oklahoma covered entities.

This artificiality of this pricing/delivery distinction is underscored by the fact that federal law doesn't use the term "340B drug," and that's because that term is really a misnomer. The drug is the same whether sold under the 340B Program or otherwise. All

[57] *See Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 36 (1922) (holding that a "so-called tax" was in substance a penalty to coerce activities otherwise outside Congress's ability to regulate) and *N.F.I.B. v. Sebelius*, 567 U.S. 519, 563–64 (2012) (holding that a provision labeled a penalty is a valid exercise of Congress's taxing power despite the label).

the 340B Program does is set the price for certain sales of drugs. So when H.B. 2048 defines a "340B drug" as a "drug that has been subject to any offer for reduced prices by a manufacturer pursuant to [42 U.S.C. § 256b] and is purchased by a covered entity as defined in [42 U.S.C. § 256b(a)(4).],"[58] it does so in recognition of the fact that the only difference between a "340B drug" and a non-340B drug is…it's price. H.B. 2048's mandate that "[a] manufacturer shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to a 340B entity, unless such receipt is prohibited by [HHS]" thus isn't really regulating the delivery of drugs to those contract pharmacies, but rather the *price* at which those drugs must be sold.[59]

In a similar case, the United States District Court for the Southern District of West Virginia granted a preliminary injunction after concluding that if a comparable West Virginia law "is an attempt to enforce 340B's pricing scheme, then the statute would be preempted according to existing Supreme Court precedent."[60] The District Court also noted that while district courts considering similar statutes had generally upheld those laws, those

---

[58] 36 O.S. § 5401(1).

[59] 36 O.S. § 5403(A).

[60] *Pharmaceutical Research and Manufacturers of America v. Morrisey*, 760 F. Supp. 3d 439, 455 (S.D.W. Va. 2024). That Supreme Court precedent was a 2011 decision in a non-preemption case where the Court concluded that third parties—in this instance, a county operating 340B entities—could not enforce the 340B Program because Congress "'centralized enforcement [of the pharmaceutical pricing agreements between manufacturers and HRSA] in the [federal] government.'" *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110 (2011) (citation omitted).

courts hadn't considered the implications of the replenishment model,[61] and that matters because the replenishment model significantly muddies the waters as to who is the actual purchaser of the 340B drugs: the contract pharmacy or the covered entity? Recall, there are only sixteen designated types of covered entities and contract pharmacies are not among them.[62] And the 340B Program does not require drug manufacturers to offer discounted drugs to anyone other than covered entities. So where H.B. 2048 effectively expands the definition of "covered entity" to include contract pharmacies, that expansion is "contrary to federal law," and accordingly "must yield."[63]

Congress, after all, struck a delicate balance with the federal 340B Program. The Program is a bargain between drug manufacturers and the federal government whereby, in exchange for access to the lucrative Medicaid and Medicare Part B markets, manufacturers help subsidize certain healthcare providers.[64] Because drug manufacturers aren't forced to participate, Congress limited the scope of the 340B Program to ensure that the price of admission wasn't too high, which might have the deleterious effect of causing drug manufacturers to opt out of Medicaid and Medicare Part B.[65] No statute "pursues its

---

[61] *Morrisey*, 760 F. Supp. 3d at 456.

[62] Health Res. & Servs. Admin., *340B Eligibility: Who Can Participate in the 340B Drug Pricing Program*, U.S. Dep't of Health & Hum. Servs., https://www.hrsa.gov/opa/eligibility-and-registration (last visited Oct. 9, 2025).

[63] *Remund v. State Farm Fire and Cas. Co.*, 483 Fed. Appx. 403, 407 (10th Cir. 2012) (quoting *Felder v. Casey*, 487 U.S. 131, 138 (1962)).

[64] *Morrisey*, 760 F. Supp. 3d at 452 (noting the "twin federal purposes" of the program).

[65] Transcript (Case No. CIV-25-726, Dkt. 78), at 62 (noting that one manufacturer has done just that, due to the rising costs of the 340B Program).

purposes at all costs," and that is especially so with respect to the 340B Program's subsidy scheme.[66]

Further, the District Court in *Morrisey* found that a state attempt to enforce 340B Program's pricing requirements would likewise impinge on Congress's intent to "'centralize[] enforcement in the government[.]'"[67] In *Astra*, the Supreme Court rejected an attempt by a county government to enforce the 340B Program by way of a third-party beneficiary theory in contract, which the Court deemed "in essence a suit to enforce the statute itself," which wasn't allowed.[68] Accepting that Oklahoma's delivery regulation in the context of the replenishment model operates as a price regulation, Oklahoma stands functionally in the same place that the county did in *Astra*, enforcing the 340B Program itself, in contravention of what "Congress contemplated when it 'centralized enforcement in the government.'"[69] And under the replenishment model, in the event that a manufacturer "den[ies], restrict[s], prohibit[s], or otherwise interfere[s] with . . . the acquisition of a 340B drug by, or delivery of a 340B drug to a 340B entity," Oklahoma regulators won't be questioning whether the drug reached a pharmacy—they'll be questioning the price at which it was delivered. This is materially the same as the

---

[66] *Rodriguez v. United States,* 480 U.S. 522, 525–526 (1987).

[67] *Morrisey*, 760 F. Supp. 3d at 457 (citation omitted).

[68] *Astra*, 563 U.S. at 118.

[69] *Morrisey*, 760 F. Supp. 3d at 456 (quoting *Astra*, 563 U.S. at 119).

unconstitutional third-party enforcement scheme that the Supreme Court dispatched with in *Astra.*[70]

Oklahoma has also stipulated that H.B. 2048 prohibits manufacturers from conditioning the delivery of the 340B discount on the provision of claims data from covered entities and contract pharmacies.[71] Plaintiffs argue that this creates a conflict with federal law in inhibiting their ability to access the 340B Program's ADR process.

Recall, before a manufacturer may access the federal ADR scheme, 42 U.S.C. § 256b(d)(3)(A) requires the manufacturer to seek an audit in compliance with § 256b(a)(5)(C). And in order to trigger an audit, a manufacturer must first demonstrate there is "reasonable cause" to believe a covered entity is violating the terms of the conditions of 340B participation either through diversion or double-discounting.[72] At an evidentiary hearing, AbbVie provided compelling testimony supporting its argument that claims data is necessary to establish the reasonable cause required to trigger an audit.[73] Essentially, AbbVie argues that the claims data clarifies otherwise opaque transaction information that has been used recently to determine that 340B transactions have been

[70] *Astra*, 563 U.S. at 113.

[71] Def.'s Resp. (Dkt. 26), at 17.

[72] 61 Fed. Reg. 65,406 (Dec. 12, 1996).

[73] Transcript (Case No. CIV-25-726, Dkt. 78), at 53–54.

unlawfully duplicated.[74] Without the claims data from the covered entity, such detection would be "impossible."[75]

Oklahoma responds that (1) the implementing regulation does not *require* claims data in order to trigger an audit and (2) HRSA has never actually utilized the "reasonable cause" standard to deny a manufacturer's request for an audit. But that response ignores the obvious: without suspicion-raising claims data, how would a manufacturer know to ever ask for an audit? The claims data, as far as the Court can tell, would be *the* way to detect possible diversion or double-dipping on discounts. The barrier to access that data created by H.B. 2048 thus stands in direct conflict with the 340B Program's dispute resolution mechanism.[76]

Accordingly, the Court finds that Plaintiffs are likely to prevail on their claim that 36 O.S. § 5403 is preempted by federal law.

**ii. H.B. 2048's parallel enforcement provision is preempted.**

Finally, Plaintiffs argue that Oklahoma's separate enforcement scheme, vested in the Attorney General, creates another conflict. [77] As previously stated, the Supreme Court has found that Congress provided HHS with the sole authority to "oversee compliance with

---

[74] *Id.*

[75] *Id.*

[76] *Atchison, Topeka and Santa Fe Ry. Co. v Lennen*, 732 F.2d 1495, 1506 (10th Cir. 1984).

[77] While AstraZeneca has named the Insurance Commissioner as a defendant, the Court notes that the provision, 36 O.S. § 5404(A), providing the Commissioner with enforcement power would not reach AstraZeneca, as that provision is aimed at "health insurers."

the 340B Program,"[78] and gave the HHS Secretary the authority to promulgate rules "in order to prevent overcharges[.]"[79] The Secretary subsequently implemented rules vesting the power to adjudicate "[c]laims by covered entities that may have been overcharged for covered outpatient drugs purchased from manufacturers" as well as "[c]laims by manufacturers of 340B drugs, after a manufacturer has conducted an audit of a covered entity . . . that a covered entity may have violated the prohibitions against duplicate discounts or diversion[,]" in the 340B ADR Panel.[80]

H.B. 2048 meanwhile vests in the Oklahoma Attorney General the authority to investigate violations of its requirements and punish those with both civil fines of up to $10,000 and criminal sanctions.[81] And disputes under H.B. 2048 related to the delivery of a "340B drug" necessarily raise a question as to whether the covered entity or contract pharmacy in question was delivered drugs at the discounted rate, which is an attempt by Oklahoma to police potential overcharges.

Further, Plaintiffs have raised non-speculative concerns about the possibility of state and federal regulators providing conflicting interpretations of federal law. For instance, in a situation where a manufacturer denies a 340B discount to an entity suspected of illegally diverting drugs to non-340B patients, an Oklahoma regulator and a federal regulator might reach a conflicting conclusion as to the patient's 340B eligibility. This isn't a farfetched

[78] *Astra*, 563 U.S. at 117.

[79] 42 U.S.C. § 256b(d)(1)(A).

[80] 42 C.F.R. § 10.3 (2024).

[81] 36 O.S. § 5404(B).

scenario, as Novartis has convincingly argued that such eligibility is subject to "a number of malleable factors" that could very easily lead to differing determinations.[82] Because the analysis is not a mere mechanical application of federal law, the potential for conflicting determinations raises the specter that Congress's intended *uniform* scheme would be derailed.[83]

Accordingly, the Court finds that Plaintiffs are likely to succeed on the merits of their claim that 36 O.S. § 5404 is preempted by federal law.

**b. H.B. 2048 forces sales at confiscatory prices, resulting in unconstitutional takings.**

"The Takings Clause of the Fifth Amendment provides that private property shall not 'be taken for public use, without just compensation.'"[84] Nor can the government "avoid the categorical duty to pay just compensation for a physical taking of property by reserving to the property owner a contingent interest in a portion of the value of the property, set at the government's discretion."[85]

When Congress created the 340B Program, it offered drug manufacturers the choice of participating in the Program as a cost of admission to the broader Medicaid and Medicare Part B markets. That exchange of value (i.e., offer discounted drugs to certain buyers for

---

[82] Plf.'s Brief (Case No. CIV-25-727, Dkt .16), at 24–25.

[83] *See Colorado Public Utilities Com'n v. Harmon*, 951 F.2d 1571, 1583 n. 14 (10th Cir. 1991).

[84] *Murr v. Wisconsin*, 582 U.S. 383, 392 (2017) (quoting U.S. Const. amend. V).

[85] *Horne v. Department of Agriculture*, 576 U.S. 350, 362–63 (2015) (internal quotation marks omitted).

access to the government-created market) meant the Takings Clause wasn't a barrier. H.B. 2048, however, isn't Oklahoma charging admission to a market of its own creation, but rather Oklahoma demanding a ransom in exchange for continued access to another's market. There is no exchange of value because Oklahoma isn't giving the drug manufacturers anything they don't already have (i.e., access to the federal market) as compensation for forcing them to make discounted sales, for prohibiting them from requiring claims data, and for making them subject to civil and criminal penalties (amongst other things). Oklahoma is instead raising the cost of exercising a "basic and familiar use[] of property"—its sale, while offering nothing in return. The Supreme Court has made clear that selling one's product in interstate commerce "although certainly subject to reasonable government regulation, is . . . not a special governmental benefit that the Government may hold hostage, to be ransomed by the waiver of constitutional protection."[86]

Nor is the Court satisfied that there is adequate evidence to conclude that this taking is being done for a public, rather than private, purpose. Even in *Kelo v. City of New London,* the high watermark of government takings power, the Supreme Court was satisfied that the City of New London's economic development plan that undergirded the city's condemnation claims of the petitioners' properties "was not adopted to benefit a particular class of identifiable individuals."[87] And the lower courts in *Kelo* had found "no evidence

---

[86] *Horne*, 576 U.S. at 366.

[87] *Kelo v. City of New London*, 545 U.S. 469, 478 (2005) (quoting *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 245 (1984)) (internal quotation marks omitted).

of an illegitimate purpose"—i.e., "to bestow a private benefit."[88] But even under *Kelo's* permissive definition of "public use," H.B. 2048 seems to effectuate a taking for purposes of bestowing a private benefit.[89] Oklahoma is taking away property from *A*, the pharmaceutical manufacturers, and giving it to *B*, the covered entities (or the contract pharmacies) to sell for windfall profits and with no requirement to put those profits towards any particular public good. The evidentiary hearing made abundantly clear that the contract pharmacies and third-party administrators keep a slice of those profits, which those private businesses do whatever they want with. The hospitals are not required to deploy 340B profits towards charity care, nor is there convincing evidence before the Court that covered entities would cease to serve high-needs patients but for the 340B profits from sales at unlimited numbers of contract pharmacies. H.B. 2048 is thus a transfer of property "adopted[,]" to some extent, "to benefit a particular class of identifiable individuals."[90] This is verboten.

Further, even if the Court were convinced there was sufficient evidence before it to conclude that H.B. 2048 served a *Kelo*-kosher public purpose, there is still the question of just compensation. The heavily discounted prices set by the 340B Program (up to 100% discounts) are confiscatory when required by Oklahoma for the merely incremental purpose of not being subject to state penalties.[91]

---

[88] *Kelo*, 545 U.S. at 478.

[89] *Id. at* 483.

[90] *Id.* at 478 (quoting *Midkiff*, 467 U.S. at 245).

[91] *See Horne*, 576 U.S. at 362–63.

Accordingly, the Court finds that Plaintiffs have established a likelihood of success on the merits of their claim that 36 O.S. § 5403 effects an unconstitutional taking.

**c. The Court delays ruling on Plaintiffs' other claims.**

Plaintiffs put forward a variety of other claims for relief, including arguments that H.B. 2048 violates the dormant Commerce Clause, violates the Contracts Clause, is void for vagueness, and is preempted by federal patent law. Because Plaintiffs have demonstrated a likelihood of success on the merits such that the Court is able to grant interim relief on the conflict preemption and Fifth Amendment claims, the Court reserves a decision on the other substantive claims for the merits stage.

## II. Plaintiffs will suffer irreparable harm in the event H.B. 2048 goes into effect.

Plaintiffs risk civil fines of up to $10,000 and possible criminal sanctions for violating H.B. 2048 after it goes into effect on November 1, 2025. If Plaintiffs choose to avoid doing business in Oklahoma, Plaintiffs risk disqualification from Medicare Part B and Medicaid. If Plaintiffs submit to H.B. 2048, they face large financial losses with little practical likelihood of recovering in the event the Court permanently enjoins enforcement of H.B. 2048 against them. Moreover, deprivation of a constitutional right is a prototypical irreparable injury.[92]

[92] *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019).

Oklahoma argues that the state will suffer its own irreparable injury by being barred from enforcing state law.[93] But the Court is already persuaded that there's a substantial showing that H.B. 2048 violated the Constitution. So that's not enough to counsel against a preliminary injunction.[94] Oklahoma next argues that an injunction threatens the health and safety of Oklahomans by cutting off a revenue stream for covered entities, but Oklahoma offered no credible evidence in support.[95]

Accordingly, the Court finds that Plaintiffs will suffer irreparable harm such that interim relief is necessary.

**III. The public interest weighs in favor of granting a preliminary injunction.**

Finally, Plaintiffs have demonstrated that the public interest weighs in favor of enjoining H.B. 2048's various provisions pending final resolution of this case. As previously stated, the state lacks "an interest in enforcing a law that is likely constitutionally infirm[.]"[96] Plus, the 340B Program does not automatically lead to discounted drugs or more access to drugs to participating patients. So, the status quo here, allowing the manufacturers to continue to impose restrictions that are valid under federal law, is unlikely to harm Oklahoma patients. The ball is in the covered entities' courts to

---

[93] Def.'s Resp. (Case No. CIV-25-726, Dkt. 26), at 24) (quoting *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018).

[94] *See Chamber of Commerce v. Edmondson*, 594 F.3d 742, 771 ("Oklahoma does not have an interest in enforcing a law that is likely constitutionally infirm.").

[95] *See, e.g.,* Chandra Expert Rep. (Case No. CIV-25-726, Dkt. 7, Ex. 25), at 34–35 (finding that increased 340B profits do not lead to better patient outcomes).

[96] *Edmondson*, 594 F.3d. at 771.

decide whether they will write scripts to be fulfilled at the pharmacies individual patients prefer. Further, because 340B participants (as well as the contract pharmacies and their third-party administrators) are free to do whatever they choose with 340B profits, it does not follow that loss of the additional profits Oklahoma seeks to funnel those entities will harm the public, and Oklahoma has provided no evidence establishing a likelihood of such harm.

## IV. The Court only enjoins 36 O.S. §§ 5403, 5404(B).

As to severability, "[t]he question of whether an unconstitutional provision of state law is severable from the remainder of the enactment is a matter of state law."[97] H.B. 2048 provides:

> If any provision of this act, an amendment made by this act, or the application of such provision or amendment to any person or circumstance is held to be unconstitutional, the remainder of this act, the amendments made by this act, and the application of the provisions of such to any person or circumstance shall not be affected thereby.[98]

The Court reads this provision to allow it to enjoin only 36 O.S. §§ 5403, 5404(B). The remainder of the statute, by all appearances, will be able to operate without the two enjoined provisions going into effect on November 1, 2025, as the remainder of the law is aimed at "health insurance issuer[s], pharmacy benefits manager[s], other third-party payor[s], or [their] agent[s.]"[99]

## *Conclusion*

---

[97] *Bishop v. Smith*, 760 F.3d 1070, 1093 (10th Cir. 2014) (citations omitted).

[98] 36 O.S. § 5405.

[99] 36 O.S. § 5402(A).

For the reasons stated above, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' various motions for preliminary injunctions (Case no. 25-cv-726, Dkt. 7; Case no. 25-cv-727, Dkt. 15; Case no. 25-cv-1156, Dkt. 13), **DISMISSES** Defendant's Motion for Judgment on the Pleadings (Case no. 25-cv-726, Dkt. 36), and **ENJOINS** the Attorney General from enforcing 36 O.S. §§ 5403, 5404(B) against Plaintiffs while these cases are pending.

Because it would be impossible, based on the record before the Court, to quantify the damage done, if any, to Defendant as a result of this injunction, the Court **ORDERS** that the security bond required by Federal Rule of Civil Procedure 65(c) be set at **ZERO**.[100]

**IT IS SO ORDERED** this 31st day of October 2025.

PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE

[100] *ETP Rio Rancho Park, LLC v. Grisham*, 522 F. Supp. 3d 966, 1014 (D.N.M 2021).